STATE of Missouri, Respondent,

v.

Samuel A. FREEMAN, Appellant.

No. SC 89119.

Supreme Court of Missouri,
En Banc.

Oct. 28, 2008.

Rehearing Denied Dec. 16, 2008.

Stephen E. Walsh, Daniel T. Moore, John M. Albright, Moore, Walsh & Albright, LLP, Poplar Bluff, MO, for Appellant.

Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

MARY R. RUSSELL, Judge.

Samuel A. Freeman ("Defendant") challenges the sufficiency of the evidence in this appeal of his conviction for first degree murder. He argues that his DNA, which was found on items at the murder scene, could have been transferred there at an earlier time. He asserts that this evidence alone could not support an inference that he was there at the time of the murder. Because the jury had a sufficient basis and made reasonable inferences in finding guilt beyond a reasonable doubt, this Court affirms the judgment.

## I. Background

Defendant and the female victim were regular patrons at the Poplar Bluff VFW club. On the night of the murder, they had been there for four to five hours. At some point in the evening, they argued over whose turn it was to use a pool table. Witnesses noted their raised voices and Defendant's slight agitation. Later, he attempted to flirt with her, briefly sitting down next to her and offering to buy her a drink, which she rebuffed. Defendant remembered having no direct physical contact with the victim or, at most, it was limited to his tapping her on the shoulder.

At last call, Defendant left the bar with an empty bottle of Galliano liqueur, which the waitress had given to him as a souvenir. Fifteen minutes later, the victim left the bar heading home, which was approximately a quarter-mile away. Her upstairs neighbor heard her arrive shortly thereafter and, going to his window, saw her exit her car and struggle to open her apartment's door. At this point a man approached from behind her, and they entered her apartment together. The neighbor did not see the man drive up, and there were no other cars in sight. The next day, the neighbor was only able to give a very general description of the man and apparently had not suspected foul play.[1]

The victim's body was found in her apartment the next afternoon by her mother. She was naked except for one knee-high stocking remaining on her leg. The other stocking was tied tightly around her neck, and her cause of death was found to be asphyxia. The autopsy also revealed a hemorrhage behind her ear, which was caused by some type of blow to the head before her death by an instrument with a smooth surface or perhaps a fist. The examination showed bruises on her thigh

---

1. The neighbor's recollection of the man became significantly more precise over time. The day after the murder he was simply able to estimate the man's height and weight and to state that he was wearing blue jeans and a dark jacket and had brown, curly hair. Defendant would have generally fit this description. But, 14 years later, the neighbor added a number of previously undisclosed details. His testimony at trial included: he suspected that he had seen the man visit the victim previously and he had arrived on a motorcycle those times, the man had wavy hair combed straight back, he wore Wrangler brand jeans and square-toed biker boots, and he had a particular cut to his fingernails. These later-added details are inconsistent with Defendant's appearance the night of the murder.

and buttocks and injuries to her vagina and near her cervix, likely caused at or just before death and consistent with penetration by a foreign object.[2]

There was reason to believe that the murderer made some effort to cover his tracks, and police discovered no helpful fingerprint evidence at the scene. The investigation proved fruitless. The case lay dormant until 2005 when samples were submitted to the Highway Patrol for DNA analysis.[3] The tests revealed Defendant's DNA on a piece of toilet paper that was found beneath the victim's shoulder. His DNA was also consistent with samples taken from the victim's two stockings, including the one found around her neck. He does not refute the presence of his DNA on the three objects. The DNA samples were from a fluid source, but it could not be determined whether it was blood, saliva, or some other type.

The jury returned a guilty verdict for first degree murder. Defendant was sentenced to life imprisonment without the possibility of parole. This Court granted transfer after opinion by the court of appeals.[4] Mo. Const. art. V, sec. 10.

## II. Sufficiency of the evidence

Defendant argues that his conviction rests on insufficient evidence in that the

---

**2.** Testimony about the victim's injuries suggested that the object was sharp in some way, but also rounded with a rigid surface. It was estimated to be six to eight inches long. Also, based on the injuries, the object may have been wider toward its base.

**3.** There was also an attempt to test DNA in 1998 on beer cans found at the scene, but no usable DNA samples were discovered.

**4.** This Court granted transfer to address the court of appeals' failure to follow the correct standard of review, which requires that reasonable inferences be viewed in the light most favorable to the verdict. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). Two inferences were possible regarding how the DNA actually arrived at the murder scene: (1) it arrived there through a horribly unlucky series of innocent transfers; or (2) Defendant directly placed his DNA there when committing the crime. Noting this, the court of appeals effectively forbade the jury from selecting the inference of Defendant's presence at the crime scene. The court of appeals stated that, since Defendant's actual presence was only one of several potential inferences, the jury's inference that Defendant was present at the scene was "illogical, arbitrary, and based upon nothing more than speculation and conjecture." This reasoning puts the court of appeals in the position of a "super juror with veto powers" drawing different inferences and conclusions from those legitimately drawn by the jury. *See State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998).

This is not the standard that Missouri courts are to apply when reviewing a jury's selection among competing inferences. In *State v. Grim*, this Court explicitly disaffirmed the circumstantial evidence rule, which puts an affirmative duty on the prosecution to disprove every reasonable hypothesis except that of guilt. 854 S.W.2d 403, 405–08 (Mo. banc 1993). If any doubt remained after *Grim* as to the state of the law, this Court removed it in *State v. Chaney*. In *Chaney*, this Court expressly abrogated the "equally valid inferences rule," which stated that "[w]here two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt." *Chaney*, 967 S.W.2d at 54 (citation omitted). This Court stated that the equally valid inferences rule "should no longer be applied" because it conflicted with the appellate court's obligation to presume that the trier of fact drew all reasonable inferences in favor of the verdict. Id.

The court of appeals, in reversing the jury's verdict, implicitly applied the equally valid inferences rule despite this Court's rejection of it. The jury's inference of Defendant's presence based on the DNA evidence in this case should not have been declared invalid as a matter of law. Under *Chaney*, the fact that the jury selected between valid inferences is not a basis for reversal. Inasmuch as the opinion below indicated otherwise, it was in conflict with decisions of this Court and is a matter for transfer. Rule 83.04.

only evidence connecting him to the crime scene was his DNA found on several objects. He asserts that, given the transferability of DNA, this evidence alone cannot support an inference that he was present in the victim's apartment. He suggests that unlike fingerprints, which are larger, more fragile, and more likely to be obliterated when moved, DNA traces are amenable to inadvertent and intact transfer from one locale to another. He asserts that his DNA's presence on the victim is of little significance because they were both present at a common location prior to the murder.[5] Defendant suggests that it is likely that the jury erroneously gave the DNA the same weight as fingerprints as an indication of his presence.

■ In reviewing the sufficiency of evidence, this Court limits its determination to whether a reasonable juror could have found guilt beyond a reasonable doubt. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). In so doing, the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. Id. As such, this Court will not weigh the evidence anew since "the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002).

■ Viewing the evidence under this standard, there is a sufficient basis for a jury to find guilt beyond a reasonable doubt. The DNA analysis was reliable,

scientific, and untainted. The jury was presented with evidence that Defendant's DNA was on a piece of toilet paper underneath the victim's body in her apartment. The toilet paper in her apartment's bathroom also had the same distinct pattern. As such, an inference arises that Defendant was present where this paper was found in the apartment. The opposite inference—that Defendant's DNA arrived on the tissue in some innocent manner—requires an unlikely series of events: the victim needed to bring the tissue with her that night to the VFW, to expose it to his DNA in some manner, and then, upon returning home, to either use it herself just before being murdered or for the killer to have retrieved it from her purse while cleaning the scene. But, no witness testified to seeing her with this tissue at the VFW, and no witness saw Defendant make physical contact with her. As such, nothing but speculation supports the inference of his DNA's mysterious innocent transport to her apartment, particularly when Defendant denied ever being there.

Other evidence also corroborates the inference of Defendant's guilt. His DNA is consistent with the samples taken from the victim's stockings, one of which was still on her leg, the other of which was found around her neck. Here, again, his transfer theory lacks support. Testimony showed that the victim wore jeans over her stockings that night and that Defendant had no contact with her legs whatsoever. Also, there is no evidence of sneezes, coughs, or other fluid discharges that

---

**5.** Defendant also notes that other, unidentified traces of DNA were found on the items and suggests that this serves to further underscore DNA's transferability. The possibility of innocent transfer was explored at trial during both direct and cross examination of a DNA criminologist, who testified that DNA can potentially be transferred from one person to another through, for example, a handshake. He also testified that wet stains transfer more easily than dry stains. But, it is not clear how an innocent transfer might have occurred in this case. No witnesses saw Defendant and the victim make contact, and Defendant recalls that, at most, he touched the victim only once by tapping her on the shoulder.

might have transferred his DNA either directly or indirectly to her at the VFW.

In addition, Defendant generally matched the description of the likely murderer given the day after the crime, and it certainly did not exclude him from being regarded as the possible perpetrator so as to undercut the DNA determination. *See* note 1. Given the inherent oddity and unreliability of the neighbor's dramatically more precise memory 14 years after the events, it was reasonable for a jury to disregard his more recent version as not credible.

Further, the evidence showed that Defendant had the opportunity and means to commit this crime. After both arguing and flirting with the victim, Defendant left the VFW club on foot at approximately 10:23 p.m. She left the VFW at 10:38 p.m. and drove the quarter-mile home. Given its proximity, he would have had time to arrive at her apartment. He then had at least an hour to commit this crime, though the jury may have believed that the timeframe was even longer.[6] In addition, he left the VFW with a bottle, and the jury could have inferred that it was used in the assault. But, even without this inference regarding the bottle, the DNA evidence, the timeline, the argument and rebuffing at the VFW, and the nature of the victim's injuries supported the jury's findings that Defendant committed this crime with some object, if not the bottle itself.[7]

In sum, the location and statistical match of the DNA evidence here, together with the other evidence favorable to the verdict, show that a reasonable jury could have found guilt beyond a reasonable doubt.

## III. Demonstrative use of bottles

■ Defendant objects to two Galliano liqueur bottles that were used as demonstrative evidence. The demonstrative evidence consisted of one 12–inch and one 18–inch Galliano bottle, presented during the questioning of a waitress who worked the nightshift at the VFW. She stated that Defendant took a Galliano liqueur bottle with him that night, which she had given him for his bottle collection. The State showed examples of both bottles, announcing that they were for the purpose of demonstrating the bottle's appearance.[8] Defendant contends that the use of the bottles was improper because they were not logically and legally relevant. He argues that this evidence likely misled the jurors into making an unfounded connection and inflamed them with the image of a sexual assault performed with the bottles.

■ The standard of review for the admission of evidence is abuse of discretion. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). This standard gives the trial court broad leeway in choosing to admit evidence; therefore, an exercise of this discretion will not be disturbed unless it "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State*

---

6. The Defendant did not offer an alibi for his whereabouts that night beyond an inadmissible note written by his mother. Even if admitted and believed by the jury, the note would have left him with an hour to commit the murder and a half hour to walk the mile home at a reasonable pace.

7. The State's pathologist testified that the injuries could have been caused by a number of

things. For example, a blow from a fist could have caused the head injury and many long, rigid, sharp objects could have caused the lower body injuries.

8. The testimony was not clear about which size bottle the Defendant took with him. At trial, only the 18–inch bottle was admitted into evidence.

*v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006).

Defendant alleges an abuse of discretion due to the bottles' irrelevancy because it was never conclusively shown that a Galliano bottle caused the victim's injuries. He asserts that the bottles are irrelevant even though the sexual assault and murder happened shortly after he left the VFW with the bottle, a quarter-mile away, and even though the state's pathologist testified that some of the injuries were caused by a long, round, rigid object with some kind of ridge on it.[9]

Relevance is commonly said to have two aspects. Logical relevance refers to the tendency "to make the existence of a material fact more or less probable." *Anderson,* 76 S.W.3d at 276. Legal relevance refers to the weighing of the evidence's probative value against "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Id. When for the limited purpose of demonstration, an object may be properly admitted even if is not connected with the defendant or offense charged so long as it is relevant, it is a fair representation of what it is demonstrating, and it is not inflammatory, deceptive, or misleading. *State v. Silvey,* 894 S.W.2d 662, 667–68 (Mo. banc 1995).

The fact that Defendant left the VFW club that night with a Galliano bottle was connected to the State's theory of the case. As such, the bottles were logically relevant. In addition, the bottles were legally relevant because they did not have a tendency to mislead the jury and did not unduly prejudice Defendant. Two waitresses testified that the bottles presented were of the type seen in his possession. Since a Galliano bottle has a very unique shape that is not commonly known, the presentation of the bottles likely served to clarify rather than mislead.[10] And, notably, the State made it clear that the bottles were being presented for demonstrative purposes only. Indeed, the prosecutor's clear statement that the bottles were mere demonstrative evidence, taken with the initial timing of their presentation during testimony about the activities at the VFW club, negates any potential to mislead the jury. Moreover, a collectable bottle, unlike certain weapons, is not clearly inflammatory in and of itself, nor is it inherently prejudicial to a defendant's character.[11]

For all of these reasons, it was not a clear abuse of discretion that the trial court allowed these bottles as demonstrative evidence.

## IV. Denial of admission of letter

■ Defendant argues that the trial court erred in refusing to admit a note purportedly written by his deceased moth-

9. The bottles have a unique, narrow shape with a cylindrical neck that widens into a conical base with smooth angular panels. The cap is a screw-top and when removed reveals raised threads.

10. For an analogous example of this Court's treatment of demonstrative evidence see *Silvey,* 894 S.W.2d at 665–69. In *Silvey,* the admittance of a butterfly knife as demonstrative evidence was held to be proper because of the knife's uniqueness and the difficulty of effectively describing it orally. Id. at 665.

11. The present scenario is distinct from the use of an inherently inflammatory weapon when that weapon is clearly unrelated to the crime charged. For example, in *State v. Perry,* 689 S.W.2d 123 (Mo.App.1985), the court of appeals reversed because a shotgun found in the backseat of the defendant's vehicle was introduced into evidence. It was clear that the crime charged had been perpetrated by a handgun. Id. at 125. As such, the shotgun had no conceivable relevance and served only to color the defendant's character as someone tending to possess dangerous weapons. Id. at 126.

er that placed him at home after midnight on the night of the murder. He asserts that it was reliable evidence and, for reasons of fairness, should have been admitted at trial. He alleges that this was an abuse of discretion depriving him of his constitutional right to due process. When reviewing an evidentiary decision, this Court will not reverse a trial court's exercise of its broad discretion absent a clear abuse. *Forrest,* 183 S.W.3d at 223.

The evidence challenged here was allegedly discovered a few days after Defendant's mother passed away, and he asserts that his sister found the note among their mother's writings. His sister would have testified that the handwriting on the note was her mother's and that it was among other writings dating back many years. The note stated that Defendant was home the night of the murder by 12:15 a.m. and suggested that the police never questioned the mother about his whereabouts that night because she had trouble speaking due to a stroke. He speculates that the note was most likely written either near the time of the events or near the time of his mother's death 12 years later, as she may have feared dying without having ever communicated this information. Defendant admits that the letter does not clearly fit any traditional hearsay exceptions in Missouri, but argues that this Court should admit it under the residual hearsay exception because the note was reliable. This Court has never adopted the residual hearsay exception rule, which allows admission of statements not specifically covered by any other exception when they have equivalent circumstantial guarantees of trustworthiness.[12]

But, even if this exception were applicable to this case, Defendant fails to satisfy it. First, the letter does not give him a satisfactory alibi because the victim likely arrived home around 10:45 p.m., and her neighbor saw a man enter her apartment immediately. Defendant would have had an hour to commit the crime, walk the mile home at a reasonable pace, and arrive there by 12:15 a.m. Second, the note is not reliable. The authorship and the timing of the note are pure speculation; anyone could have penned it or his mother could have authored it at any point during a 12–year period. Given this uncertainty, the trustworthiness associated with hearsay recorded close in time to events or when in anticipation of impending death cannot be invoked here. Moreover, the declarant's relationship to Defendant and the fact that she did not communicate this evidence at the time of the crime raises the specter that the statement is an invention. Given the suspect nature of this hearsay, Defendant fails to show that the trial court abused its discretion by denying its admittance.

## V. Conclusion

Defendant fails to show that his conviction rests on insufficient evidence or that the trial court committed an abuse of discretion in making its evidentiary rulings. The judgment is affirmed.

STITH, C.J., PRICE and BRECKENRIDGE, JJ., and SMART, Sp.J., concur; WOLFF, J., concurs in separate opinion filed; TEITELMAN, J., concurs in opinion of WOLFF, J. FISCHER, J., not participating.

12. The only case Defendant cites in support of his position is a concurrence in *State v. Bell,* 950 S.W.2d 482, 486 (Mo. banc 1997) (Limbaugh, J., concurring). In this concurrence,

Judge Limbaugh advocates for the future adoption of the residual hearsay exception in Missouri, consistent with the federal rules of evidence and some state courts.

MICHAEL A. WOLFF, Judge.

This Court transferred this case from the court of appeals, which conducted an extensive review of the trial record to determine whether the evidence was sufficient for the jury to conclude that Samuel Freeman was guilty of first degree murder. This Court's review is premised on the conclusion that the court of appeals decision conflicts with other appellate decisions, making transfer to this Court appropriate under art. V, sec. 10 of the Missouri Constitution.

My concern, and the reason for writing separately, is that the court of appeals—acting as an error-correcting court—be given the deference it deserves in its role of reviewing a record for sufficiency of the evidence. The tests or doctrines discussed in the principal opinion, which are the source of the conflict the principal opinion discerns, can serve to put the court of appeals "in short pants" by making its error-correcting review subject to the second-guessing of a higher court whose business should not be to duplicate the efforts of the intermediate court of appeals.

The present judicial article—article V of the Missouri Constitution approved by the voters in 1976—gave the court of appeals its "long pants." Prior to the present article V, the court of appeals had very limited jurisdiction. In criminal cases, for example, that court surprisingly was limited to hearing appeals only in misdemeanor cases; all felony cases were heard in this Court. The purpose of the current article V is to allocate the judicial resources of the state among the various courts, including upgrading the court of appeals. To allocate judicial resources better, article V upgraded the jurisdiction of the court of appeals to become the error-correcting court in various classes of cases. That is why the present article V authorizes transfer to this court when the issue is of *general* interest and importance or to resolve conflicts in governing principles.

Under the constitution, a dissenting judge in the court of appeals may transfer a case to this Court when the judge believes that an opinion of the court of appeals is contrary to previous decisions of this Court or to other decisions of the court of appeals. Mo. Const. art. V, sec. 10. The court of appeals may transfer cases to this Court after opinion, and this Court may transfer cases either before or after opinion in the intermediate court "because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the existing law, or pursuant to supreme court rule." *Id.; see, Rule 83.*[1]

Accordingly, appeals that lie initially with the court of appeals are lodged there with the understanding that the court of appeals is an error-correcting court. Such cases can be transferred to this Court because this Court is a law-declaring court.

As to those cases that already have been reviewed in the court of appeals, this Court should not see itself simply as another error-correcting court. When it does so, the Court foregoes its proper role in making the law of Missouri a coherent and understandable whole and diverts its

---

1. For the reader unaccustomed to Missouri's transfer system, when this Court receives or takes a case on transfer from the court of appeals, either prior to or after an opinion in that court, this Court hears the case as though it were on appeal from the trial court, not the court of appeals. The opinion in the court of appeals, if there is one, does not become part of the published record of the case. This discretionary review serves the same purpose as the writ of certiorari in the United States Supreme Court but has the advantage of not cluttering the official reports of the Missouri courts, as published in the South Western Reporter, with decisions that have been overruled or superseded by this Court.

energies to correcting errors that are of little or no general interest or importance in the clarification or development of the law.

When I speak of declaring the law, I address a highly traditional role of courts in our Anglo–American system, a role that can be misunderstood. Carved in stone at the corner of Missouri's Supreme Court building is the centuries-old principle, which, translated from Latin, says: "To declare the law, not to make it." (Jus dicere, non dare). Another common translation uses "speak" rather than "declare," but either way, it expresses the principle that courts are bound by the law as made by others—the legislative and executive branches of government, and the constitution. Missouri's courts also follow common law principles, whose origins are in English common law, which are expressed in precedent cases.[2] But laws enacted by the general assembly, and regulations of the executive branch that are authorized by those laws, trump the courts' declarations of the common law. And the commands of the state and federal constitutions trump the laws enacted by the general assembly and the regulations of the executive branch. The courts' duty is to find, declare, apply and enforce the law.[3]

The division of responsibility among the appellate courts of Missouri exists in other state constitutions, serving a similar purpose. "The 'law declaring' court is the highest state court and its jurisdiction is limited to important questions of law," as one commentator explains the division of authority between appellate courts. Thomas C. Marks, Jr., *Perspectives: State Traditions, and Peculiarities: Jurisdiction Creep and the Florida Supreme Court*, 69 ALB. L.REV. 543 (2006). "In deciding cases within this limited jurisdiction, the 'law declaring' court may correct errors, but its 'error correcting' function is only incidental to its 'law declaring' function. The 'error correcting' court hears appeals from trial courts and its decisions are final unless the issue before it was within the limited jurisdiction of the 'law declaring' court above it in the judicial hierarchy." *Id. See, e.g., In the Interest of A.S.W.*, 226 S.W.3d 151, 155 (Mo. banc 2007) (general interest and importance); *Baugh v. Life & Cas. Ins. Co. of Tenn.*, 299 S.W.2d 554 (Mo.App.1957) (conflicts between appellate decisions); and *Longhibler v. State*, 832 S.W.2d 908, 909 (Mo. banc 1992) (re-examination of existing law). *See also*, Matthew E. Gabrys, *A Shift in the Bottleneck: The Appellate Caseload Problem Twenty Years After the Creation of the Wisconsin Court of Appeals*, 1998 WIS. L.REV. 1547 (1998).

---

**2.** *See* Section 1.010, RSMo 2000 ("The common law of England and all statutes and acts of parliament made prior to the fourth year of the reign of James the First, of a general nature, which are not local to that kingdom and not repugnant to or inconsistent with the Constitution of the United States, the constitution of this state, or the statute laws in force for the time being, are the rule of action and decision in this state, any custom or usage to the contrary notwithstanding, but no act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state, for the reason that it is in derogation of, or in conflict with, the common law, or with such statutes or acts

of parliament; but all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof."); *see also* Joseph Benson, *Reception of the Common Law in Missouri: Section 1.010 as Interpreted by the Supreme Court of Missouri*, 67 Mo. L.REV. 595 (2002).

**3.** The concepts of this paragraph are taken from a general-interest newspaper column I wrote in March 2006. *See The Courts' Ideals Are Carved in Stone*, March 28, 2006, *available at* http://www.courts.mo.gov/page.asp?id=1079.

These questions are not matters of appellate "jurisdiction" because this Court's appellate jurisdiction under article V is plenary. These questions are, rather, questions about how the resources of the judiciary ought to be rationally allocated between this Court and the court of appeals under this state's constitution.

In this case, the court of appeals carefully reviewed the evidence presented in the trial court and concluded that the state had not presented sufficient evidence to support the conviction. The principal opinion of this Court should not be construed as a revision or second-guessing of the sufficiency analysis conducted by the court of appeals. Such an opinion would commit the fallacy of collapsing the roles of a law-declaring and an error-correcting court. As the majority of this Court makes clear in footnote 4 of its opinion, "[t]his Court granted transfer to address the court of appeals' failure to follow the correct standard of review, which requires that reasonable inferences be viewed in the light most favorable to the verdict." *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). This Court did not grant transfer to conduct a second sufficiency analysis but rather to clarify the standards of law governing such analyses.

The traditional standard is not made clearer by the application of "tests" and "rules." For instance, this Court in *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998), disapproved a rule or test that says that evidence that points to two equally valid inferences is not evidence that can sustain a verdict. The real issue remains whether there is evidence that supports the verdict.

The applicable law is simply stated and so well known as to require no citations: There must be some evidence that supports the verdict. The evidence can be either direct or circumstantial. Inferences that the jury makes from the evidence must be reasonable. The verdict must not be based on speculation or conjecture.

There are no tests or doctrines that can help with this simple and important judicial function, unless one wants to make the inquiry more complicated than it needs to be. The traditional appellate role of reviewing the record is to make sure that there was evidence sufficient, as a matter of law, for the jury to render a guilty verdict. The role for the court of appeals, as it is when this Court conducts such a review, is not to be a super-jury that overrules a jury when it disagrees with its decision. The appellate courts' role properly is circumscribed to view the evidence to determine whether, as a matter of law, there was enough evidence for the jury to reach its verdict—regardless of whether agrees with it. The point of the process is to ensure that a jury's decision is based upon evidence, not speculation. Judges, thus, should not defer slavishly to a jury where it appears that the verdict is based upon speculation.

This is a close case, a case grown cold over 14 years from the time of the victim's death to the time the small bits of material were identified as containing Freeman's DNA. Yet this was evidence, and the inference of guilt drawn by the jury was reasonable.

What is important in this case, and in the large number of cases reviewed in the court of appeals for sufficiency of the evidence as a matter of law, is that this Court defers to that court's judgment regardless of whether this Court agrees with its result—if its review appears to have been conducted appropriately by the law's traditional standard. That is how a well-organized judiciary allocates its resources, and this Court should be mindful of it.

It seems to me that it would be entirely possible for the court of appeals to review a record such as the record in this case and conclude that the evidence was insufficient—without misstating the law. Where this is the situation, I would leave the court's conclusion intact—not because I agree with it, but because the court would have performed its function under the correct legal standard.

Subject to the foregoing concerns, I take seriously the principal opinion's premise that the legal errors of the court of appeals make this a case of general interest and importance, and I agree with the result of its review.