**STATE of Missouri, Respondent,**

v.

**Rodney DONELSON,
Defendant/Appellant.**

**No. ED 95132.**

Missouri Court of Appeals,
Eastern District,
Division Five.

July 5, 2011.

Brocca Leah Smith, Assistant Public Defender, St. Louis, MO, for Appellant.

Chris Koster, Attorney General, Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before GARY M. GAERTNER, JR., P.J., MARY K. HOFF, J. and PATRICIA L. COHEN, J.

## OPINION

PER CURIAM.

Rodney Donelson (Defendant) appeals from the trial court's judgment and sentence imposed after a jury found Defendant guilty of two counts of first-degree murder, in violation of Section 565.020 [1], and two counts of armed criminal action, in violation of Section 571.015. The trial court sentenced Defendant to life imprisonment without parole on the first count of murder and to fifty years' imprisonment

---

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

on the first count of armed criminal action, the sentences for those counts to be served concurrently with each other. The trial court sentenced Defendant to life imprisonment without parole on the second count of murder and to fifty years' imprisonment on the second count of armed criminal action, the sentences for those counts to be served concurrently with each other but consecutively to the first count of murder and the first count of armed criminal action.

We reverse the trial court's judgment with regard to the two counts of armed criminal action on the ground that those counts were barred by the statute of limitations, Section 556.036 RSMo Cum.Supp. 2009, and vacate the corresponding sentences of fifty years of imprisonment on each count. We affirm the trial court's judgment with regard to the two counts of first-degree murder.

### Factual and Procedural Background

Viewed in the light most favorable to the verdict, the evidence at trial established the following facts:

In July 2000, Cassandra Scott (Scott) was found dead in her apartment. She was lying face down on the floor in a pool of blood and with a kitchen knife protruding from the back of her neck. A container of antifreeze, a telephone cord, and a pair of men's underwear were found nearby. A purse strap was wrapped around Scott's neck and arm. The murderer had apparently broken a window on the front door to gain entry into Scott's apartment. Investigators discovered that the blood near Scott's body had been diluted by some other liquid and that the liquid was on Scott's buttocks. Investigators found an empty bottle of isopropyl alcohol in the apartment, and the knife found in Scott's neck matched some knives in the kitchen sink. An autopsy revealed that Scott died from a combination of strangulation by the purse strap and five cuts to the right side of her neck, which pierced the jugular vein. Laboratory testing on the men's underwear found near Scott's body revealed that two stains on the underwear were blood and seminal fluid. DNA tests matched the blood to Scott and the seminal fluid to Defendant.

Defendant worked at the daycare where Scott worked, and Defendant's brother lived in the apartment below Scott's apartment. Although police investigators questioned Defendant about Scott's death approximately two months after her body was found, Defendant stated that he did not know anything about the murder. However, Defendant told investigators that he had been in Scott's apartment to repair a VCR three days prior to her murder. Defendant told investigators that he might have left a bag of clothes in Scott's apartment, including a pair of white boxer shorts. Defendant claimed that he left the clothes there because he liked to flirt with women at the daycare center and he wanted to look clean. Defendant then changed his story and said that he had been in Scott's apartment on the night of her murder and that they were preparing to engage in sex when they heard a car door slam. Scott suspected her boyfriend was there, so Defendant gathered his clothes, ran down the rear stairs into his brother's apartment, and left the building. Defendant's brother, however, denied that Defendant was in his apartment on the night of the murder. When investigators confronted Defendant with his brother's denial about Defendant's whereabouts, Defendant subsequently changed his story again and claimed he had been at Scott's apartment to repair a VCR.

In September 2005, Defendant was living in an apartment above the apartment of Barbara Hampton (Hampton). On Sep-

tember 14, 2005, at approximately 10:40 p.m., Hampton was having a telephone conversation with her daughter. Hampton interrupted the conversation to answer a knock at the door, then told her daughter that Defendant was there and wanted to use Hampton's telephone to make a call. Hampton ended the call with her daughter.

The following day, Hampton was found dead in her apartment. She was lying on the bedroom floor with a gag tied around her mouth. Hampton's dress and slip were pushed up, and her underwear had been removed and left near her feet. Hampton had sustained an injury to her vaginal area. Several bottles were located near Hampton's body: dish washing liquid, laundry detergent, and an empty bottle of isopropyl alcohol. Near Hampton's body, police investigators found the cap from the bottle of isopropyl alcohol, dried liquids and powders, a kitchen knife, and a telephone cord. An autopsy revealed that Hampton died from suffocation caused by the gag pushing her tongue back so that it blocked her airway. The autopsy also showed that Hampton had sustained a fresh injury to her vaginal area that could have been caused by a sharp object or by something stretching the tissue. Blood was found on Hampton's slip, on a pillowcase, and on the cap from the bottle of isopropyl alcohol. DNA tests revealed that Defendant was the source of the majority of DNA found in the blood on the bottle cap. Defendant's DNA also was found in some of the blood stains on the pillowcase. Trace amounts of DNA consistent with Defendant's DNA was found on telephone cord and on Hampton's slip.

Police investigators questioned Defendant about Hampton's death approximately one month after her body was found. Defendant told investigators that he had spoken with Hampton the night before her

body was found but that he had left with a friend named Robert Ellis (Ellis) and did not return home until the next morning. Ellis, however, denied that Defendant had ever spent the night with him and specifically denied that Defendant had spent the night with him in September 2005.

Consequently, after further investigation, police questioned Defendant a second time. This time, Defendant admitted that he had lied in his first statement because he had spent the night with Brenda Jacobs (Jacobs) and he did not want his girlfriend, Melinda Freeman (Freeman), to know he had been cheating on her. Defendant became angry and agitated during the second interview with police. Defendant then admitted he had been in Hampton's apartment a few years earlier to help her husband carry in a mattress. Hampton's husband had died approximately two years before Hampton's murder. After Defendant was arrested and informed of his *Miranda*[2] rights, Defendant repeated the story he had given to investigators during the second interview.

Police investigators then questioned Freeman, with whom Defendant had lived in the apartment above Hampton's apartment. Freeman provided investigators with Jacobs' telephone number. She stated that Defendant had instructed her to tell police that he had been cheating on her with Jacobs. Investigators subsequently interviewed Jacobs, who stated that she and Defendant had not spent any night together in September 2005.

After his arrest, Defendant also discussed Scott's murder with police investigators. Defendant claimed that he had gone to Scott's apartment the day before her murder to repair the toilet. Defendant said that he must have left a bag of

**2.** *Miranda v.Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

clothes in Scott's apartment; however, on the night of Scott's murder, he had stayed with his girlfriend, Latoya Vanderford.

At trial, Defendant did not testify or present any evidence. The jury subsequently found him guilty as charged, and the trial court imposed sentence. This appeal follows.

## Point I

In his first point on appeal, Defendant claims the trial court erred in imposing judgment and sentence for the two counts of armed criminal action because those counts were barred by the three-year statute of limitations under Section 556.036 RSMo Cum.Supp.2009.

■ Whether or not a statute of limitations applies is a question of law, and our review is *de novo*. *State v. Maples*, 306 S.W.3d 153, 155 (Mo.App. W.D.2010); *State v. Rains*, 49 S.W.3d 828, 831 (Mo. App. E.D.2001).

■ "Criminal prosecution of felonies can be subject to no time limit, a three-year limit, or a ten-year limit." *State v. Hyman*, 37 S.W.3d 384, 388 (Mo.App. W.D.2001). The general statute of limitations for criminal offenses, Section 556.036 RSMo Cum.Supp.2009, provides, in pertinent part:

A prosecution for murder, forcible rape, attempted forcible rape, forcible sodomy, attempted forcible sodomy, or any class A felony may be commenced at any time.

Except as otherwise provided, prosecutions for other offenses must be commenced within the following periods of limitation:

(1) For any felony, three years, except as provided in subdivision (4) of this subsection;

. . .

(4) For any violation of section 569.040, RSMo, when classified as a B felony, or any violation of section 569.050 or 569.055, RSMo, five years.

Prosecution of the felony of armed criminal action, however, is limited to three years because armed criminal action is an unclassified code felony and cannot be designated a class A felony. *Hyman*, 37 S.W.3d at 388–90.

Any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action, which shall be punished by a term of imprisonment of not less than three years without parole, probation, conditional release, or suspended imposition or execution of sentence for a period of three calendar years. Section 571.015.1. Any person convicted of a second offense of armed criminal action shall be punished by a term of imprisonment of not less than five years. Section 571.015.2. Any person convicted of a third or subsequent offense of armed criminal action shall be punished by a term of imprisonment of not less than ten years. Section 571.015.3.

The State cites our previous decision in *State v. Cunningham*, 840 S.W.2d 252 (Mo. App. E.D.1992). In *Cunningham*, the defendant was initially charged with aggravated rape, which was expressly designated a class A felony. 840 S.W.2d at 252. The defendant was later convicted of forcible rape, an unclassified felony. *Id.* On appeal, the defendant argued that he should not have been convicted of forcible rape because the three-year statute of limitations had run before the initial charge for aggravated rape was filed. *Id.* This Court affirmed the defendant's conviction, reasoning that the statute of limitations, Section 556.036, allowed a prosecution for "murder or any class A felony to be com-

menced at anytime" and that forcible rape was an unclassified felony punishable by life imprisonment; thus, forcible rape was the equivalent of a class A felony and not subject to the three-year statute of limitations. *Id.* at 253.

In *Hyman*, however, the Western District found the reasoning in *Cunningham* to be inapplicable to time limits for prosecuting armed criminal action. *Hyman*, 37 S.W.3d at 390. The Western District found that armed criminal action, as set forth in Section 571.015.1 RSMo 1994, is a code offense that was specifically defined in the 1977 Criminal Code. The Western District reasoned that armed criminal action, although it can be joined to any felony and despite its interrelationship with the commission of an underlying felony, retains its separate identity because it is a separate offense that carries its own penalty, sentence enhancement, and minimum sentencing provisions. *Id.* at 392–93. The Western District further reasoned that armed criminal action is an unclassified code felony offense "other than murder or a class A felony"; thus, "[a]rmed criminal action qualifies as 'any felony' " for purposes of the three-year statute of limitations in Section 556.036.2 RSMo Cum. Supp.2009. *Id.* Accordingly, the Western District found that the three-year statute of limitations controls in prosecutions for armed criminal action. *Id.* In its brief, the State "finds no fault in the Western's District's analysis" in *Hyman* and suggests that *Cunningham* should be reviewed in light of the conflict with *Hyman.* We find *Cunningham* distinguishable from the instant case.

■ We agree with the Western District's reasoning in *Hyman*, which involved charges similar to the charges in the case before us. Here, the record reveals that the first instance of armed criminal action with which Defendant was charged oc-

curred on July 28, 2000, in conjunction with the murder of Scott. The second instance of armed criminal action with which Defendant was charged occurred on September 15, 2005, in conjunction with the murder of Hampton. The State filed charges against Defendant alleging two counts of murder and two counts of armed criminal action on July 17, 2009. Clearly, both instances of armed criminal action occurred more than three years prior to the date Defendant was charged with those offenses. Consequently, the trial court erred in imposing judgment and sentence for the two counts of armed criminal action because those counts were barred by the three-year statute of limitations under Section 556.036 RSMo Cum.Supp. 2009. *See Hyman*, 37 S.W.3d at 393. Point granted.

### *Point II*

In his second point on appeal, Defendant claims the trial court erred in denying his motion for judgment of acquittal at the close of all evidence on the two counts of murder because the State failed to prove beyond a reasonable doubt that Defendant committed first-degree murder. Defendant argues that the State presented insufficient evidence from which a reasonable jury could conclude that Defendant committed first-degree murder. We disagree.

■ When reviewing the sufficiency of the evidence to support a defendant's conviction, this Court's determination is limited to whether a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008). We view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict and disregard all evidence and inferences to the contrary. *Freeman*, 269 S.W.3d at 425. Evidence is sufficient to support the jury's verdict finding the de-

fendant guilty where a reasonable inference supports guilt, even if other "equally valid" inferences do not. *State v. Hollins,* 331 S.W.3d 342, 344 (Mo.App. E.D.2011). Circumstantial and direct evidence are afforded the same weight, and we will not disturb a jury's verdict that is based upon circumstantial proof. *State v. Jennings,* 322 S.W.3d 598, 600 (Mo.App. S.D.2010). We will not re-weigh the evidence because the jurors might have believed all, some, or none of the witnesses' testimony when considered with the facts, circumstances, and other testimony in the case. *Freeman,* 269 S.W.3d at 425; *Jennings,* 322 S.W.3d at 600.

A person commits the crime of first-degree murder if he knowingly causes the death of another person after deliberation upon the matter. Section 565.020.

■ In this case, given our standard of review, we find there was a sufficient basis for the jury to find Defendant guilty of first-degree murder beyond a reasonable doubt.

First, Defendant's DNA was found at two separate murder scenes involving two separate victims. Defendant's DNA was present in seminal fluid on a pair of boxer shorts found in Scott's apartment. Scott's blood was found on the boxer shorts containing Defendant's DNA. Defendant's DNA was present in a blood stain on the cap from a bottle of isopropyl alcohol and in a blood stain on a pillowcase found in Hampton's apartment. Nothing in the record suggested that the DNA evidence was anything but reliable, scientific, and untainted. Although the jury could have inferred Defendant's DNA was innocently transferred to both murder scenes, the jury was entitled to infer that Defendant directly placed his DNA at the murder scenes while committing the crimes. *See Freeman,* 269 S.W.3d at 424 n. 4, 425–26. Second, the murders of the two women shared common characteristics: both victims had been strangled; telephone cords, kitchen knives, chemicals and other substances were found on and near the bodies; and empty bottles of isopropyl alcohol were found at both crime scenes. Third, although the murders occurred years apart, Defendant knew both victims and either lived near or had access to both of the victims' apartments. In his statements to police investigators, Defendant admitted being inside Scott's apartment on the night of her murder. Hampton's daughter testified that she was in the middle of a telephone conversation with Hampton when Defendant came to Hampton's apartment on the night of her murder. Fourth, Defendant provided numerous inconsistent and false statements to police in order explain his whereabouts around the times the victims were murdered. Defendant's explanations, however, were contradicted by the testimony his brother, Freeman, Jacobs, and Ellis.

Consequently, because sufficient evidence supported the jury's verdicts, the trial court did not err in denying Defendant's motion for judgment of acquittal. Point denied.

### Conclusion

We reverse the trial court's judgment with regard to the two counts of armed criminal action on the ground that those counts were barred by the statute of limitations, Section 556.036 RSMo Cum.Supp. 2009, and vacate the corresponding sentences of fifty years of imprisonment on each count. We affirm the trial court's judgment with regard to the two counts of first-degree murder.