

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| vs. | ) | No. SD33556 |
| | ) | |
| JASON SCOTT WARREN, | ) | **Filed: September 11, 2015** |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF BUTLER COUNTY

Honorable Michael M. Pritchett, Circuit Judge

**<u>AFFIRMED</u>**

A jury convicted Jason Scott Warren ("Defendant") of assault in the second

degree in breaking the foot of James Blackwell ("Victim") with a motor vehicle, and of

speeding. The trial court sentenced Defendant as a prior offender to concurrent terms of

five years in the Department of Corrections for assault in the second degree and 120 days

in county jail for speeding. Defendant appeals only the trial court's judgment for assault

in the second degree, and, in a single point, asserts that "[t]he trial court erred in entering

judgment and sentence for . . . assault in the second degree . . . in that there was not

sufficient evidence to show that [Defendant] 'recklessly' caused serious physical injury

to [Victim]." We disagree, and affirm the trial court's judgment.

1

**Standard of Review**

Our Supreme Court has described our standard of review as follows:

> In reviewing the sufficiency of evidence, this Court limits its determination to whether a reasonable juror could have found guilt beyond a reasonable doubt. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). In so doing, the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. Id. As such, this Court will not weigh the evidence anew since "the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002).

*State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008). In addition:

> Evidence is sufficient to support guilt if any reasonable inference supports guilt, even if other equally valid inferences do not. *State v. Breedlove*, 348 S.W.3d 810, 814 (Mo.App. S.D.2011). . . . "The credibility and the effects of conflicts or inconsistencies in testimony are questions for the jury, and the appellate court will not interfere with the jury's role of weighing the credibility of witnesses." *State v. Coleman*, 263 S.W.3d 680, 683 (Mo.App. S.D.2008).

*State v. Simrin*, 384 S.W.3d 713, 718 (Mo.App. S.D. 2012). Finally, a claim the evidence was insufficient to support a verdict of guilty in a criminal case is reviewed on the merits and not as plain error even when the defendant failed to raise the claim before the trial court as in this appeal. *State v. Claycomb*, No. SC94526, 2015 WL 3979728, *2-3 (Mo. banc June 30, 2015).

**Facts and Procedural History**

Defendant was charged by amended information with assault in the second degree in that Defendant "recklessly caused serious physical injury to [Victim] by means of a dangerous instrument by trying to run over [Victim] with a vehicle, running over [Victim's] foot, breaking it." The amended information also alleged that Defendant was

a prior offender. The assault charge was consolidated with a separate charge of driving in excess of the posted speed limit.

Defendant waived his right to counsel, and represented himself at trial. The trial was to a jury.

At trial, Victim testified that he was the general manager of the Pony, a strip club, and was working Saturday into Sunday, April 20 and 21, 2013. In the early morning hours of Sunday, April 21, 2013, Victim was approached by a customer who stated that Defendant was "harass[ing]" the customer and the customer's girlfriend, and asked Victim "to keep an eye on [Defendant] because [the customer] didn't want any trouble started." Victim had never "met" Defendant before, and did not "recall" ever seeing him at the Pony before. When the customer returned to his table, Defendant "g[o]t up from where he was sitting at . . . the stage and approach[ed the customer and his girlfriend's] table and start[ed] arguing with" them.

Victim approached the table and attempted to "separate" Defendant and the customer and his girlfriend. Defendant continued to argue, and Victim told Defendant "it was time to go." Victim then forcibly removed Defendant from the Pony by "push[ing]" him toward the door. During the time Victim was removing Defendant, Defendant "kept turning around trying to go back to the table. [Defendant] was yelling about how he had just bought three beers and that he wanted those beers." Defendant also told Victim that Defendant was "an undercover FBI agent." Once Victim got Defendant to the door, Defendant "started getting a little more violent as far as agitated, more in my face" and refused to leave "until he got his beers."

3

Victim called the police. While Victim was on the phone with the police, Defendant shouted that he "was with the Mafia and then he said well, you [f--ed] up now, I'm going to kill you. I'm going to get a gun and I'm going to shoot you." Defendant then began "walking towards his vehicle," and Victim followed "to make sure that [Defendant] didn't have a gun." As Defendant was getting into his vehicle, Victim told Defendant "the cops are on their way, you know, you can't go anywhere. The cops will be here and everything else. [Defendant] continue[d] to say I'm going to go -- I'm getting my gun, I'm going to kill you." Victim also took a picture of Defendant and Defendant's license plate.

Once Defendant got into his vehicle, his window was down and he continued to yell "that he is getting his gun, he is coming back, he's killing [Victim]." Defendant began to "pull[] back slowly" from his parking space while Victim walked beside "the driver's side" of Defendant's vehicle and told Defendant "the Police were coming, [you don't] need to leave." Victim testified Defendant "knew [Victim] was there." "[A]ll of the [sic] sudden [Defendant] gunned it" and ran "over [Victim's] [right] foot when [Defendant] pulled backwards and hit [Victim] hard enough that [his] shoe came off."

Defendant then drove out of the parking lot onto the road, made a U-turn at a nearby intersection, and reentered the parking lot "at a great rate of speed." While doing so, Defendant yelled "you want me to run over you, you want me to kill you, I'll kill you." Victim believed Defendant was going to hit him and moved "back towards [a] couple of parked cars." Defendant "squealed through the parking lot and out another exit heading towards Poplar Bluff."

4

Victim could barely walk on his foot, but was unable to leave work at the Pony until his shift was over. When his shift was over, Victim went to the hospital and learned his foot was broken "in three spots." A "boot" was placed on Victim's foot. The toenail on Victim's "pinkie" toe "fac[es] outward from [Victim's] toe."

Edwin Edwards, a regular patron of the Pony who had become "friends" with Victim, observed Defendant "in his car hit [Victim] so hard that his foot came out of his shoe." Edwards testified that Defendant hit Victim "[w]hen [Defendant] put [the vehicle] in gear to go forward," but then acknowledged he did not actually see the vehicle run over Victim's foot because Edwards was on the opposite side of the vehicle from Victim. Edwards had "[n]ever seen [Defendant] before." On cross examination, Edwards testified "[Victim] was in the front of [Defendant's vehicle], yes. But, when [Defendant] gave it the gas to leave [Victim] had got to the driver's side and that's when [Defendant] hit [Victim's] foot because like I said I was on the opposite side of the car so I couldn't see [Defendant] actually hit -- I didn't see [Defendant] hit the foot."

Trooper Brian Arnold with the Missouri State Highway Patrol testified that he stopped Defendant at "[a]pproximately one forty-five in the morning" on April 21, 2013, at a Break Time convenience store "on the north end of Poplar Bluff." According to Trooper Arnold's radar unit, Defendant was traveling 101 miles per hour in a 65 miles per hour speed zone shortly before he was stopped. Defendant was "erratic" and "almost combative," and "threatened to kill me and come to my house and kill my family." Defendant also "seemed agitated." Defendant denied that he was speeding.

Deputy Wade Dare with the Butler County Sheriff's Office testified that he transported Defendant from the Break Time on the north end of Poplar Bluff to the Butler

County Justice Center. After arriving at the Justice Center, Defendant asked Deputy Ware "if [he] had any children and if [he] ever wanted to see them again."

Defendant testified that he "never [saw Victim beside his vehicle]. I never -- the last I seen him he was in the door of the Pony," and when he left the parking lot at the Pony, he "did not come back to the parking lot. I proceeded straight." After Defendant left the Pony, he "was running over the speed limit, but [he] didn't meet no cops." Defendant did not "think it was my car that [Trooper Arnold] clocked." Defendant denied making threats.

The trial court instructed the jury in Instruction No. 5 that Defendant was guilty of assault in the second degree if the jury found beyond a reasonable doubt that Defendant "recklessly caused serious physical injury to [Victim] by means of a dangerous instrument by running over his foot with a motor vehicle." Instruction No. 5 further told the jury that:

> A person acts "recklessly" as to causing serious physical injury if he consciously disregards a substantial and unjustifiable risk that his conduct will result in serious physical injury and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.
>
> . . . .
>
> As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

The trial court also instructed the jury on the lesser included offense of assault in the third degree (i.e., Defendant "recklessly created a grave risk of serious physical injury to [Victim]"). Defendant did not object to the trial court's instructions to the jury.

Defendant appeals only the trial court's judgment for assault in the second degree. As noted, Defendant claims that there was insufficient evidence that he "recklessly" caused the injuries to Victim.

Thus, Defendant's mental state is at issue in this appeal. From Victim's testimony, a reasonable juror could have found beyond a reasonable doubt that: (1) Victim had just removed Defendant from the Pony against Defendant's will, (2) Defendant knew Victim had reported Defendant's conduct to law enforcement and requested that law enforcement respond to the Pony, (3) Defendant was extremely angry with Victim and threatened to kill Victim, (4) while Defendant was backing out of his parking space, Victim was walking beside the driver's side of Defendant's vehicle, Defendant's driver's side window was down, Defendant was shouting threats at Victim and Victim was talking to Defendant attempting to persuade Defendant not to leave the Pony before law enforcement arrived, (5) Defendant knew Victim was present beside the driver's side of Defendant's vehicle, and (6) Defendant, while initially backing out slowly, unexpectedly accelerated his vehicle and quickly increased the vehicle's speed and in the process ran over Victim's right foot breaking it. From these facts, a reasonable juror could have inferred beyond a reasonable doubt that Defendant in fact knew Victim was walking beside the driver's side of Defendant's vehicle while he was backing up, and that the unexpected increase in the speed of Defendant's vehicle prevented Victim from being able to avoid the tire of Defendant's vehicle.

From this evidence, a reasonable juror could have found beyond a reasonable doubt that Defendant's sudden acceleration while slowly backing out of a parking space with an individual walking beside the vehicle attempting to persuade Defendant not to

7

leave was a "conscious[] disregard[] [of] a substantial and unjustifiable risk" that the sudden acceleration would result in serious physical injury to the individual walking beside the vehicle. Similarly, a reasonable juror could have found beyond a reasonable doubt that Defendant's conscious disregard was "a gross deviation from the standard of care which a reasonable person would exercise in the situation" with the result that Defendant acted recklessly in causing Victim's right foot to be broken. Therefore, sufficient evidence supports the conviction.

Defendant's point is denied, and the trial court's judgment is affirmed.


Nancy Steffen Rahmeyer, J. - Opinion Author

Gary W. Lynch, J. - Concurs

William W. Francis, Jr., J. - Concurs