**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Ricky Don RALSTON, Defendant–
Appellant.**

**No. SD 31912.**

Missouri Court of Appeals,
Southern District,
Division Two.

June 10, 2013.

512

Craig A. Johnston, Columbia, for Appellant.

Chris Koster, Atty. Gen., and Robert J. (Jeff) Bartholomew, Asst. Atty. Gen., for Respondent.

Before SCOTT, P.J., BURRELL, C.J., and SHEFFIELD, J.

PER CURIAM.

Ricky Don Ralston ("Defendant") appeals the judgment entered after a jury convicted him of second-degree statutory sodomy (Count I), second-degree statutory rape (Count II), and sexual misconduct involving a child less than 15 years of age by indecent exposure ("sexual misconduct") (Count III). *See* sections 566.034, 566.064 and 566.083.1(1).[1]

Defendant's first two points challenge the sufficiency of the State's evidence to prove: (1) second-degree statutory sodomy "as it was charged in [the] information"[2] because the victim testified about a different act and a nurse practitioner's testimony was unclear as to the act alleged by the State; and (2) that either of "two different type of acts of indecent exposure" occurred during the time frame charged for sexual misconduct. Point III charges

plain error in that the verdict-directing instruction for sexual misconduct "failed to specify a particular act or instruct the jurors that they must unanimously agree on the same act" in a multiple-acts case contrary to *State v. Celis–Garcia*, 344 S.W.3d 150 (Mo. banc 2011).

For reasons explained herein, we deny all three points and affirm the judgment and convictions.[3]

## General Principles of Review

"Appellate review of a sufficiency of the evidence claim 'is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.'" *State v. Bowman*, 337 S.W.3d 679, 688 (Mo. banc 2011) (quoting *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002)). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (quoting *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010) (internal quotations omitted)).

The jury may accept the testimony of a witness in whole or in part, or reject it entirely. *Nash*, 339 S.W.3d at 509. Ac-

---

1. References to section 566.083 are to RSMo Cum.Supp.2009. Unless otherwise stated, all other statutory references are to RSMo 2000.

2. Defendant's point also states that "the act of deviate sexual intercourse that [he] was charged with was hand-to-genital contact[.]" This assertion is refuted by the record, which reveals that Count I did not specify a method of committing deviate sexual intercourse. In the argument section of his brief, Defendant properly characterizes Count I as simply charging "deviate sexual intercourse" and

that [t]he jury was *instructed* that the alleged act of deviate sexual intercourse was that [Defendant] had touched [the victim's] vagina with his hand (emphasis added). As a result, we will treat Defendant's point as challenging the sufficiency of the evidence for the type of act (hand-to-genital contact) described in the verdict-directing instruction.

3. Defendant does not challenge his Count II conviction of second-degree statutory rape.

cordingly, we view the evidence in the light most favorable to the verdict and give the State the benefit of all reasonable inferences, but we do "not supply missing evidence or give the State the benefit of unreasonable, speculative or forced inferences." *State v. Langdon,* 110 S.W.3d 807, 811–12 (Mo. banc 2003).

### Facts and Procedural Background

D.L. was born in June 1993. When she was in the seventh grade, Defendant moved in with D.L.'s mother ("Mother"). In the home at that time were D.L., her younger brother (J.L.), and her younger sister. D.L.'s biological father ("Father") sometimes stayed with them "a few nights . . . every once in a while." The family subsequently moved with Defendant to a residence in Taney County on a particular road where D.L. lived for "almost a year, not quite" ("the Taney County address").[4] "[H]alfway through" that time, Defendant's daughter, S.,[5] also lived there. D.L. described the residence as a mobile home. D.L.'s bedroom—which lacked a door—was "[i]n the very back of the house." She shared the room with her younger sister.

In July 2009, when she was sixteen, D.L. left the Taney County address and moved in with her aunt and uncle. In September 2009, she began meeting with a counselor. In January 2010, D.L. told her counselor that she had "been having dreams" that stopped when she "moved out[.]" She told her counsel that "they were so vivid and real it scared [her]. And [she] didn't know what they were." D.L. described her dreams to the counselor, and the counselor had her write them down with "every detail[.]" D.L. eventually "reach[ed] a point" where she was "positive" that the dreams were real "[a]nd not imagined[.]"

D.L. testified that "[o]n the weekends" when her sister was away at a friend's house, Defendant "would come into [D.L.]'s room in the middle of the night," undress her, and rape her. D.L. testified that Defendant put his penis inside her vagina and also touched her vagina with his mouth. D.L. explained that Mother gave her alcohol, sleeping pills, and the pain medication "Ketoprofen." Mother also "put [D.L.] on birth control[.]" D.L. testified that Defendant "would add alcohol to [her] drinks." Defendant did not come into D.L.'s room unless she had been given alcohol, sleeping pills, or both. D.L. said she was awake when the described events happened, but it "felt like [she] was watching it from a different perspective[.]" She testified that this happened "[t]hree or four, maybe more than that" times, and it only happened at the Taney County address.

Mitzi Huffman testified for the State. She was "a registered nurse, family nurse practitioner . . . a sexual assault nurse examiner, and a forensic interviewer." In February 2010, Ms. Huffman interviewed and physically examined D.L. Ms. Huffman observed a "partial," "well[-]healed" "tear through [the] posterior fourchette" of D.L.'s hymenal area, and she opined that the injury was "consistent with blunt force trauma." She could not indicate the cause of the blunt force trauma.

On cross-examination, Ms. Huffman indicated that she had documented in her records that D.L. reported "penile and finger, digital penetration," and that the "sexual encounters" with Defendant happened

---

**4.** At trial, the witnesses and counsel for the parties referred to the residence at this location by using the name of the road on which the residence was located. We have omitted the road name in order to avoid drawing any unnecessary attention to D.L. and J.L.

**5.** Based upon the record, it appears that Defendant's daughter was a minor.

"two to three times a month" from "Christmas of '08 till [sic] May of '09." Ms. Huffman understood this to mean that D.L. was "[e]ither having penile or digital penetration" "two to three times per month[.]" Ms. Huffman testified that "[b]y [her] records it says that [D.L.] has denied oral sex by [Defendant]. And [D.L.] denies anal sex."

J.L. was born in January 1996, and he "last lived" with Mother and Defendant at the Taney County address in March 2009, when he was 13 years old. J.L. testified that, back then, "[i]f [Defendant] was [urinating] outside and [J.L.] was outside doing yard work with [Defendant] he would turn around and call [J.L.] a 'cock gazer.' " When Defendant showed "his genitals and call[ed] [J.L.] a 'cock gazer,' " it made J.L. feel "[n]ot good at all. Really bad." "It made [him] feel sick." The prosecutor asked J.L. if Defendant exposed his genitals and called J.L. a "cock gazer" only once or more than once while J.L. was living at the Taney County address. J.L. stated that "[i]t happened a lot and very often."

J.L. briefly mentioned something else for which we quote his entire testimony:

[J.L.]: [Defendant] would pull the skin around his testicles really tight and call them "baby brains" and show them to me.

[State]: Okay. How was it that that came about?

[J.L.]: He would just kind of do it randomly.

[State]: Okay. Was it, uh, inside the house or outside or somewhere else?

[J.L.]: Normally it would be inside the house, and I was like going from room to room. I would walk around the corner and he'd kind of ambush me.

S. and other witnesses testified on behalf of Defendant. S. testified that she stayed with Defendant "maybe like a month … around Christmas" "maybe two years" before the trial that started on December 12, 2011. She described Defendant's residence as a trailer having two bedrooms, one of which she shared with D.L. and D.L.'s younger sister when S. was not sleeping in the living room. She confirmed that D.L.'s room was in "the very back" of the trailer and did not have a door.

Defendant testified on his own behalf. He said that the family had lived in various places, but they moved to a trailer at the Taney County address "at the beginning of '08." Then, "[r]ight after Christmas [they] got another trailer" that was moved "down there." Defendant testified that the first trailer "was pretty bad" and that the second trailer would permit "the kids" to "have their own rooms." Defendant described that the trailer had a room for Mother and himself, and it had a room for "D.L." that did not have a door. J.L. "slept in the living room," "[a]long with [Father] when [Father] was there." Defendant denied having "any type" of "sexual contact with [D.L.]" or having given her alcohol, but he admitted being aware that Mother gave D.L. "birth control" "because she was having cramps" and that Mother also gave D.L. "Ketoprofen" and possibly "sinus pills."

Defendant denied ever purposefully showing his genitals to J.L. or making any statement regarding "baby brains" in reference to his genitals. He testified that "[J.L.] came around the corner one time" sometime "around March of 2009" when Defendant had been cutting wood and was urinating. Defendant stated that "[J.L.] looked down at [him], and [Defendant] made a statement: 'What are you doing, cock gazing?' " Defendant testified that it happened in "a split second[,]" he was surprised by J.L., and [Defendant] turned

away. Defendant admitted that his question to J.L. was "[p]robably not the best choices of words[.]"

As relevant to the issues raised in this appeal, Count I charged Defendant with "statutory sodomy in the second degree" by having "deviate sexual intercourse with D.L." when she "was less than seventeen years old[.]"[6] Count II alleged the same age for D.L. as stated in count I, but it charged that Defendant committed "statutory rape in the second degree" by having "sexual intercourse" with D.L. Count III charged that Defendant committed "sexual misconduct involving a child by indecent exposure" by "knowingly expos[ing] his genitals to J.L., a child less than fourteen years of age, and [Defendant] did so knowing that such conduct was likely to cause affront or alarm to the child." All three counts of the State's information alleged that the charged conduct occurred "on or between December 1, 2008 and August 31, 2009[.]"

Instruction No. 5, the Count I verdict-directing instruction, directed the jury to determine, *inter alia*, whether "on or about between December 1, 2008, and August 31, 2009" Defendant "touched [D.L.'s] vagina with his hand[.]"

Instruction No. 9, which was patterned after MAI–CR 3d 320.29.1,[7] was the verdict-directing instruction submitted by the State for the Count III sexual misconduct charge and read as follows:

> As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about between December 1, 2008, and August 31, 2009, in

the County of Taney, State of Missouri, [Defendant] knowingly exposed his genitals to [J.L.], and

> Second, that [D]efendant knew or was aware that such conduct was likely to cause affront or alarm to [J.L.], and
>
> Third, that at that time [J.L.] was twelve or thirteen years old, and
>
> Fourth, that [D]efendant knew or was aware [J.L.] was less than fifteen years of age, then you will find [D]efendant guilty under Count III of sexual misconduct involving a child by indecent exposure.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [Defendant] not guilty of that offense.

Defendant voiced no objection to Instruction No. 9.

The jury found Defendant guilty of each count, and Defendant (who had waived jury sentencing) was sentenced by the trial court. Additional facts related to the parties' closing arguments will be set forth in the context of our analysis of Point III. We address Defendant's points in the order presented.

## Analysis

### *Point I—Sufficiency of the Evidence as to First–Degree Statutory Sodomy*

■ Defendant's first point contends: "the only act of deviate sexual intercourse testified to by [D.L.] was that there was mouth-to-genital contact, but the act ... [he] was charged with was hand-to-genital

---

6. Counts I and II also charged that Defendant was over 21 years old at the time of this offense, a required element under sections 566.034 and 566.064. Defendant's brief concedes that Defendant "was older than 21 during the charged time period."

7. Except where stated otherwise, the referenced pattern jury instructions are from Missouri Approved Instructions—Criminal, Third Edition (2010, effective January 1, 2011) ("MAI–CR 3d").

contact, and the only act of deviate sexual intercourse testified to by [Ms. Huffman] was 'digital penetration[.]' " Defendant further contends that Ms. Huffman "did not clearly elaborate as to *what* was penetrated, *who* did the penetration, or *when* that particular penetration occurred" (emphasis added).[8]

Regarding D.L.'s trial testimony, Defendant is correct. While she testified that Defendant touched her vagina with his mouth, she did not expressly state that Defendant touched her vagina with his hand at that or any other time. Defendant argues that while "mouth-to-genital contact is covered by the definition of deviate sexual intercourse, that was not the act the jury was asked to find by the verdict director, and thus [it] cannot be used to support [Defendant's] conviction," citing *State v. Miller*, 372 S.W.3d 455, 466 (Mo. banc 2012).[9] While Defendant's argument, as far as it goes, is correct, it does not entitle him to relief because other evidence sufficiently supported the hand-to-genital conduct alleged in the jury instruction.

▆▆▆▆ As our high court stated in *Miller*, "[a] criminal defendant, 'as a matter of due process, is entitled to notice of the charges against him and may not be convicted of any offense of which the information or indictment does not give him fair notice.' " 372 S.W.3d at 466 (quoting *State v. Goddard*, 649 S.W.2d 882, 889 (Mo. banc 1983)). "The State is required to prove the elements of the offense it charged, not

the one it might have charged." *Miller*, 372 S.W.3d at 467. The defendant's appeal in *Miller* included a sufficiency of the evidence challenge regarding two convictions, first-degree statutory sodomy and deviate sexual assault. *Id.* at 462–63. The alleged crimes involved the same victim and were charged and instructed as having occurred during the same 2004–2005 time frame. *Id.* The evidence at trial, however, was that these events had actually occurred at a much earlier point in time, between 1998 and 1999, when the victim was even younger. *Id.* at 463–64. The State argued that it met its obligation to prove that the charged conduct occurred when the victim was under the statutory age limitation of 14 years "despite the disparity in the dates[.]" *Id.* at 464.

After first noting that "[t]ime is not essential in child sexual abuse cases because it can be impossible to ascertain specific dates of the sexual abuse[,]" the Court reasoned that it is still necessary to charge the time of the offense with enough specificity to provide notice to a defendant, protect against double jeopardy, and protect the " 'reliability of a unanimous verdict.' " *Id.* at 464–65 (quoting 41 Am.Jur.2d *Indictments and Information* [Section] 128 [ (2005) ] ). The Court reasoned that it would be a violation of Miller's right to be free from double jeopardy if Miller's conviction of an offense charged as having occurred in 2004–2005 were allowed to

---

8. Point I does not challenge either the sufficiency of the information or the form of the verdict director used to submit Count I.

9. Defendant also cites *State v. Jackson*, 896 S.W.2d 77, 82–83 (Mo.App. W.D.1995). In that case, two counts were charged alleging separate violations of the same statute within the same time frame. The Western District found that the location of a particular offense as stated in the charge "was significant for purposes of identifying and distinguishing be-

tween the numerous incidents of sodomy[,]" *id.* at 83, and reversed the convictions on two such counts, finding that "[t]he incident in the bedroom" proven at trial "appear[ed] to be a separate offense which was not included in the amended information or the jury instructions." *Id.* While *Jackson* and the instant case both involved evidence of multiple offenses, *Jackson* can be distinguished because there was only one offense of second-degree statutory sodomy charged in this case.

stand based upon evidence from 1998–1999 because "nothing would preclude the State, in the future, from charging Miller" with the same offense for conduct occurring in 1998–1999. *Id.* at 468.

Here, Count I charged second-degree statutory sodomy via "deviate sexual intercourse" that allegedly occurred "on or between December 1, 2008 and August 31, 2009[.]" Instruction No. 5 referenced the same time frame, and it directed the jury to determine whether Defendant committed deviate sexual intercourse by "touch[ing D.L.'s] vagina with his hand[.]" The following testimony from D.L. was relevant to that claim. D.L. moved from the Taney County address where she lived with Defendant in July 2009 after living there "not quite" a year; Defendant's daughter came to stay with them "halfway through" this time; the room D.L. shared with her sister in the two-bedroom residence at the Taney County address was at the back of the trailer and had no door; and Defendant's sexual contact with her had not happened at any residence other than the Taney County address.

Ms. Huffman also testified about certain key facts relevant to the claim. D.L. told her that the "sexual encounters" happened from Christmas of 2008 until May 2009; she documented that D.L. stated that she had experienced penile and digital penetration; and D.L. denied having engaged in either oral or anal sex.[10]

Defendant argues that "[Ms.] Huffman's testimony did not clearly establish that [D.L.] told her that during the charged time period that [Defendant]'s hands touched her vagina." Defendant cites *State v. Goad,* 926 S.W.2d 152, 156 (Mo.

App. E.D.1996), where the court found that a sodomy conviction could not stand on a caseworker's testimony that the child victim showed the caseworker the vaginal area of a drawing and said that was where the defendant had touched her. But in *Goad,* the victim did not specify what the defendant had used when touching her. *Id.* at 157. Here, the jury could reasonably infer from a combination of the testimony provided by D.L. and nurse Huffman that the "who," "what," and "when" challenged by Defendant had been sufficiently proven.

## Who *had deviate sexual intercourse with D.L.?*

A reasonable juror could infer that Defendant was the person D.L. was referring to while speaking with Ms. Huffman because it was Defendant's sexual activity with D.L. that was the subject matter of Ms. Huffman's examination of D.L., and D.L. did not refer to any other person during that examination and interview.

## What *was penetrated with* what?

The jury could also reasonably infer that Defendant penetrated D.L.'s vagina with his finger. Ms. Huffman testified that D.L. reported "penile and finger, digital penetration," and she understood that this meant "[e]ither having penile or digital penetration" "two to three times a month" during the relevant time frame. Defendant argues that "the use of the word 'either' allows for the possibility that it was only penile penetration[.]" While that is true, and the jury could have drawn that conclusion from her testimony, it was reasonable for the jury to infer instead that

---

**10.** To the extent that D.L.'s prior statement to Ms. Huffman was inconsistent with her trial testimony, section 491.074 provides that "[n]otwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

*both* penile and digital penetration happened during the time period described. *See State v. Freeman,* 269 S.W.3d 422, 424 n. 4 (Mo. banc 2008) ("the fact that the jury selected between valid inferences is not a basis for reversal"); and *State v. Chaney,* 967 S.W.2d 47, 54 (Mo. banc 1998) ("[t]he equally valid inferences rule was effectively abolished by *State v. Grim* [, 854 S.W.2d 403 (Mo. banc 1993) ]"). And this ability to choose between reasonable inferences also permitted the jury to reasonably infer that what was being digitally penetrated was D.L.'s vagina, not her anus, based on D.L.'s statement to Ms. Huffman that she had not engaged in "anal sex" with Defendant. Finally, the difference between Ms. Huffman's testimony that D.L. denied oral sex and D.L.'s trial testimony that Defendant touched her vagina with his mouth does not remove the probative value of Ms. Huffman's other testimony.[11] "A jury may accept part of a witness's testimony, but disbelieve other parts." *State v. Pond,* 131 S.W.3d 792, 794 (Mo. banc 2004).

### When *did the penetration occur?*

The jury could reasonably infer from the evidence presented, including the descriptions of the trailers given by Defendant and S., that the conduct charged in Count I occurred in D.L.'s bedroom in the second trailer, which Defendant testified they had obtained "right after" Christmas 2008 and before D.L. moved out in July 2009. Ms. Huffman had also noted the time period of the acts as between Christmas 2008 and May 2009 based upon D.L.'s statement to her. Both the inferred and stated time periods were within the time frame charged.

A reasonable juror could find from the aforementioned evidence that each of the elements of Count I, as alleged in Instruction No. 5, was proven beyond a reasonable doubt. Point I is denied.

### Point II—Sufficiency of the Evidence as to Sexual Misconduct

 In his second point, Defendant contends "[t]he trial court erred in overruling [his] motion for judgment of acquittal at the close of all the evidence" because J.L. "testified as to two different type of acts of indecent exposure, [but] the State failed to establish that either occurred during the charged time period" of "on or about between December 1, 2008, and August 31, 2009[.]" Defendant insists that J.L. "never testified to—nor was he asked—when the alleged exposures occurred." Defendant argues that according to J.L.'s testimony and Defendant's testimony about moving into the first trailer "at the beginning of" 2008, "the alleged exposure would have occurred sometime between January[ ] 2008, and March[ ] 2009." Defendant also argues that a different time frame could have been established by D.L.'s testimony concerning the date that Defendant started living with them, calculated to be April 2006, and when D.L. said J.L. moved out, January 2009, except for "a couple of weeks" in Summer 2009.[12]

Defendant goes on to argue that "[a]s in *Miller,* because there was insufficient evidence proving that [Defendant] committed an act charged under Count [III] during the time period charged under the count, he is entitled to be discharged." Defen-

---

11. We are also presuming, *arguendo,* that the referenced testimony was inconsistent. It is possible that D.L. understood "oral sex by [Defendant]" to mean only mouth to penis contact.

12. D.L. said that in January 2009, Mother "sent" J.L. to live with their aunt and uncle. She also testified that J.L. "came back in the summer and was spending a couple of weeks with us." She testified that she was referring to the summer of 2009.

dant maintains that while it is "possible" that the offense occurred between December 1, 2008 and August 31, 2009, "[i]t is also possible that it occurred many months before that period. It cannot be determined from the record which of these is so." As discussed in our analysis of Point I, the State was not required to eliminate other inferences that could be drawn from the testimony so long as the inference supporting the verdict was a reasonable one. *See Freeman,* 269 S.W.3d at 424 n. 4 (jury could select between valid inferences), and *Chaney,* 967 S.W.2d at 54 (equally valid inferences rule no longer controls).

Further, Defendant overlooks that J.L. testified that "those things"—referring to the exposures by Defendant—happened when J.L. was living at the Taney County address. J.L. testified that he left this residence in March 2009. The jury could reasonably infer that these offenses happened after Christmas 2008 when the family moved into the second trailer at the Taney County address, based upon the description of this residence by D.L., S., Defendant and J.L.'s testimony that the Taney County address had a room for D.L. Again, it did not matter that D.L. and J.L. testified to a somewhat different time period for when J.L. was residing in the trailer. The jury was free to accept some parts of a witness's testimony and reject other parts. *See Pond,* 131 S.W.3d at 794. Thus, the jury could reasonably find from the evidence that Defendant exposed his genitals to J.L. between December 1, 2008 and August 31, 2009 as charged. Point II is denied.

### *Point III—Plain Error Claim as to Count III Verdict Director*

█ In his final point, Defendant requests that we review the Count III ver-

dict-directing instruction for plain error on the ground that it "failed to specify a particular act or instruct the jurors that they must unanimously agree on the same act" when "the State presented evidence of two types of exposure—[Defendant] urinating in front of [J.L.] and [Defendant] showing his testicles to [J.L.]"—and it was unclear "as to which act [Defendant] was found guilty[.]" [13] In seeking plain error review, Defendant concedes that his claim was not properly preserved for appellate review as required under Rule 28.03 because he did not object at trial to the jury instruction he now claims resulted in a manifest injustice. Indeed, as earlier noted, his converse instruction parroted the same language he now criticizes. "Any issue that was not preserved can only be reviewed for plain error[.]" *State v. Severe,* 307 S.W.3d 640, 642 (Mo. banc 2010); *see also* Rule 30.20.[14]

As we noted in *State v. Dean,* 382 S.W.3d 218 (Mo.App. S.D.2012):

Plain error review is discretionary. A defendant is not entitled to relief pursuant to the plain error rule unless he demonstrates that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result absent a correction of the error.... A claim of plain error places a much greater burden on a defendant than an assertion of prejudicial error. The outcome of plain error review, furthermore, depends heavily on the specific facts and circumstances of each case.

*Id.* at 223–24 (citations and quotation marks omitted). Plain error review involves a two-step analysis. First, we de-

---

**13.** Defendant did not allege plain error in regard to counts I or II.

**14.** All rule references are to Missouri Court Rules (2012).

termine if there was plain error, *i.e.,* evident, obvious and clear error affecting the defendant's substantial rights. If we find plain error, our second step is to "decide whether the error actually resulted in manifest injustice or a miscarriage of justice." *Id.* at 224.

Defendant's plain error claim hinges upon *Celis–Garcia,* in which our supreme court noted that "a defendant does not waive plain error review by failing to object to a faulty jury instruction or by failing to submit a correct instruction." 344 S.W.3d at 154 n. 3. The defendant in that case was charged with two counts of first-degree statutory sodomy—one for each of two victims—within a specific multi-month time frame. The verdict director for the first count read:

As to Count 1 regarding the defendant . . . if you find and believe from the evidence beyond a reasonable doubt:

First, *that between the dates of January 01, 2005 and March 31, 2006[ ],* in the County of Saline, State of Missouri, *the defendant or [her boyfriend] placed her or his hand on [victim's] genitals,* and

Second, that such conduct constituted deviate sexual intercourse, and

Third, that at that time [victim] was less than twelve years old, then you are instructed that the offense of statutory sodomy in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that statutory sodomy in the first degree, the defendant . . . acted together with or aided [her boyfriend] in committing that offense, then you will find the defendant . . . guilty under Count 1 of statutory sodomy in the first degree. However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant . . . not guilty of that offense.

*Id.* at 154–55 (emphasis as added in the Court's opinion; footnote omitted). The verdict director for the second count merely substituted the second victim's name. *Id.* at 155. The State presented evidence involving one or both victims in seven separate incidents "of statutory sodomy that occurred at different times (some more than three days apart) and in different locations." *Id.* at 156. Our high court found that it was "impossible to determine whether the jury unanimously agreed on any one of these separate incidents, [and, as a result,] the verdict directors violated [the defendant's] constitutional right to a unanimous jury verdict under article I, section 22(a) of the Missouri Constitution." [15] *Id.* at 158. The court held:

[T]o comply with the constitutional mandate that the jury reach a unanimous verdict, the verdict director not only must describe the separate criminal acts with specificity, but the court also must instruct the jury to agree unanimously on at least one of the specific criminal acts described in the verdict director. To the extent MAI–CR and its notes on use conflict with this substantive law, they are not binding.

*Id.*

Here, "[the] risk is exactly the same as identified in *Celis–Garcia,* and rendered

**15.** In doing so, the Court cited *State v. Pope,* 733 S.W.2d 811, 813 (Mo.App. W.D.1987). *Id.* at 157. *Pope* was remanded after each of two charges specified a different victim and a particular method of deviate sexual intercourse, but the verdict directors only specified each victim; they did not inform the jury "of the specific act defendant was charged with[,]" and there was evidence that the defendant had committed the offenses by using more than one method. 733 S.W.2d at 812–13.

the instructions in this case erroneous." *Barmettler v. State*, ED98568, 399 S.W.3d 523, 528 (Mo.App.E.D.2013). In light of our high court's ruling in *Celis–Garcia*, the error in the Count III verdict-directing instruction was "evident, obvious and clear." *See Dean*, 382 S.W.3d at 224.[16] As a result, we next consider whether Defendant has demonstrated that the error resulted in manifest injustice.

■ An error warranting a new trial on the basis of plain error is generally one that is outcome determinative, and "the defendant bears the burden of establishing manifest injustice." *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). Defendant first argues that the manifest injustice here is much like the risk of a double-jeopardy violation identified in *Miller*.[17] We are not persuaded by that argument. In *Miller*, the time frame for the conduct as charged (2004–05) was essentially replaced by proof at trial of an offense that occurred during an entirely different period of time (1998–99)—a time frame that would not have been apparent from a review of either the charge or the judgment of conviction. 372 S.W.3d at 463–64, 468. The instant case differs from *Miller* because, as discussed in our Point II analysis, the evidence established that the conduct at issue occurred within the time frame set forth in both the Information and the corresponding verdict-directing instruction.

■ Defendant alternatively argues that a manifest injustice resulted "because

there simply is too strong a possibility that the jury did not unanimously agree on any single act of exposure[,]" and his defenses to the two different types of exposure were different. We are not persuaded by this argument either.

To reiterate, the outcome of plain error review "depends heavily on the specific facts and circumstances of each case." *Dean*, 382 S.W.3d at 224. *Barmettler* illustrates this; it involved the same plain error as in *Celis–Garcia* but ruled differently as to prejudice. Given the trial record and defense strategy in *Celis–Garcia*, our supreme court found it "more likely that individual jurors convicted her on the basis of different acts." 344 S.W.3d at 159. *Barmettler's* different record yielded a different conclusion:

> The facts of this case, however, are much different than *Celis–Garcia*. Although [the victim] made a passing reference in her testimony to the existence of other uncharged and ongoing incidents of abuse, the record shows that the evidence and arguments presented at trial focused almost exclusively on two specific alleged incidences of abuse. Because there was no emphasis or focus in this case by the State on the uncharged acts of sexual abuse, we find no basis in the record to hold that there was a reasonable risk that any jurors may have been confused or misled by the verdict directors....

399 S.W.3d at 530.

We find this case more like *Barmettler* than *Celis–Garcia* in this respect. J.L. did

---

**16.** The fact that the error at issue was actually plain is as much as conceded in the State's argument that "while the submission of a single verdict director ... failed to differentiate between the two acts, *the question is whether [Defendant] suffered a manifest injustice.*" (Emphasis added.)

**17.** We also note that the assessment of the risk of a double-jeopardy violation in *Miller*

came in the context of a properly preserved insufficient evidence claim; it was not a matter reviewed for plain error. 372 S.W.3d at 463–68. The only plain-error review granted in *Miller* was for a different reason: one verdict director relied on a method of committing the offense (touching through clothing) that was not included in the statute at the time. *Id.* at 470–71 (citing section 566.067).

mention the "baby brains" matter as we quoted in the facts—nine transcript lines in a two-day, 10–witness case that generated nearly 300 transcript pages of proceedings in the jury's presence. But the trial as to J.L. focused almost exclusively on Defendant's penis exhibitions—the "cock gazer" incidents that "happened a lot and very often" according to J.L. Indeed, we find no other reference to "baby brains," "brains," or even "testicles" in the State's examination or cross-examination of any of the ten trial witnesses. This was true even when the State cross-examined Defendant; only "cock gazing" was discussed.

The parties' closing arguments as to J.L. also focused on the cock gazing incidents. The State's initial closing argument cited only cock gazing, as did the defense argument. The lone, one-sentence mention of "baby brains" occurred only in rebuttal, as part and in the context of the State's fair reply to defense counsel's attempt to depict cock gazing as a one-time accident.[18]

Defendant himself cites *State v. Farris*, 125 S.W.3d 382, 390 (Mo.App. W.D.2004),

for the proposition that instructional error results in manifest injustice where it is *apparent* to an appellate court that such error affected the jury's verdict. As *Farris* also notes, this is a defendant's burden to prove. *Id.* Such effect was not apparent to the Eastern District in *Barmettler* and, based on the whole record here, is not apparent to us in this case. We reject Point III and affirm the judgment.[19]

DANIEL E. SCOTT, P.J., and MARY W. SHEFFIELD, J., concur.

DON E. BURRELL, J., concurs in part and dissents in part in separate opinion.

DON E. BURRELL, J.

I concur in points I and II of the principal opinion, that the Count III verdict-directing instruction was clearly erroneous, and that Defendant suffered no manifest injustice based on his double-jeopardy argument. I respectfully dissent only from the majority's holding that Defendant also failed to prove that he suffered a

---

**18.** We quote the closing argument on this issue. First, defense counsel:

> Ricky admitted calling [J.L.] a "cock gazer." He admitted to it being inappropriate. Uh, but he also told you about the circumstances of what happened that day. He was outside in the yard doing work. He was urinated—urinating out in the backyard. [J.L.] came around the corner, saw him, and Ricky turned around and called him a "cock gazer." Certainly inappropriate.

> Many of the things that you've heard Ricky talk about himself are inappropriate. The drinking, the drug use. Okay. But I want you to consider whether calling him a "cock gazer" meets the elements of the crime that he's charged with.

> He testified that [J.L.] was the one who came out there, ran out, came around the corner and saw him. That is not intentionally exposing his genitals to [J.L.]. That's an accident. An accident that probably

shouldn't have happened, uh, but nevertheless an accident.

In rebuttal, the prosecutor argued:

> Uh, now, [J.L.] and Ricky Ralston testified differently about how that situation happened with, uh, Ricky Ralston calling [J.L.] a "cock gazer." He said it happened many times. Uh, he couldn't put a number on it, but it happened a lot. And it also happened that he was, uh, doing something with the skin on his testicles and calling them "baby brains" multiple times.

> Um, why Ricky Ralston would admit, uh, that it happened one time by accident, I don't know, except that he says it happened by accident. It maybe keeps him from being found not guilty. Maybe he wants to be found not guilty.

**19.** We would be remiss if we did not note our supreme court's action, and the MAI Committee's efforts, to revise MAI–CR 3d 304.02 and its Notes on Use this year to address *Celis–Garcia* problems.

manifest injustice based on a verdict unanimity problem.

In *Celis–Garcia*, after finding the challenged verdict-directing instruction clearly erroneous, our high court further found that the error resulted in a manifest injustice because even though the jury could have disbelieved the defendant's evidence, "the fact that [the defendant] relied on evidentiary inconsistencies and factual improbabilities *respecting each specific allegation* of hand-to-genital contact ma[de] it *more likely* that individual jurors convicted [her] on the basis of different acts." 344 S.W.3d at 159 (emphasis added). The defendant argued that different surrounding circumstances—such as one of the locations being visible to the public and another being situated away from the home on different property—made each event unlikely for its own reasons. *Id.* at 159. The Court distinguished such an argument from cases in which the defendant simply alleges that the victim has fabricated the entire story. *Id.* at 158.

In *State v. LeSieur*, 361 S.W.3d 458, 464 (Mo.App. W.D.2012), another case where the instructions failed to require the jury to consider specific acts, the western district of our court distinguished the manifest injustice finding in *Celis–Garcia* on that very ground, finding that LeSieur did not attack "any specific details of the separate incidents of statutory rape" but instead "argued generally that the [v]ictim had fabricated *all* of the allegations." (Emphasis as stated in original.) Because the defense to the separate incidents did not vary in *LeSieur*, the court found "it unlikely that individual jurors convicted

[the defendant] based on different acts." *Id.* at 465.

Here, Defendant denied that he ever referred to his testicles as "baby brains" and exposed them to J.L. inside the residence. In contrast to that outright denial, Defendant admitted exposing his penis to J.L. on one specific occasion while urinating outside. His defense to that incident was not a claim that it did not occur; his defense was that the exposure was accidental. And defense counsel admitted in his closing argument that Defendant had inappropriately called J.L. a "cock gazer" when he realized that J.L. had observed him.

Defense counsel also pointed out to the jury that when J.L. had been previously interviewed, he made no allegation about "[Defendant] showing his genitals to [J.L.]" or anything "inappropriate like that."[20] That particular attack on J.L.'s credibility was, of course, relevant to all of J.L.'s claims. But defense counsel's argument against the outdoor exposure claim was different. While admitting that Defendant's statement about J.L. being a "cock gazer" was inappropriate, he argued that Defendant's exposure of his genitals to J.L. on that single occasion was an accident that happened when Defendant "was outside in the yard doing work" and that the jury should consider the accidental nature of the exposure when deciding whether the State had proven the elements of the crime. *Cf. State v. Beine*, 162 S.W.3d 483, 486–87 (Mo. banc 2005) (where the Court found insufficient evidence of "alarm" or "affront" to support the convictions and—in finding a former version of section 566.083 to be unconstitutional—

---

**20.** An "[i]ntensive in-home specialist," Cristin Martinez, testified for the defense that she had worked with this family for four weeks sometime near the time that all the rest of the children had decided to ... move to [their aunt's house], and during that time she spoke with J.L. She testified that J.L. told her that he did not want to live in the home because of Defendant's drinking, "there was a lot of arguing," and "the house stinks." She did not recall J.L. having expressed any other concerns.

.

stated that an accidental exposure of genitalia by a man to boys in a public restroom without more egregious facts would constitute "constitutionally protected conduct").

As a result, I reluctantly conclude that the unanimity problem present here prejudiced Defendant in the same manner found to have produced a manifest injustice in *Celis–Garcia*. Because the Count III verdict director did not address the fact that different acts constituting indecent exposure had been alleged, I cannot say that the resulting verdict necessarily reflected a rejection of the "accidental" defense to the outdoor allegation. Given the evidence presented, and the language of the verdict director, one or more jurors could have discredited J.L.'s testimony about the "baby brains" incidents while believing that the outdoor exposure corroborated by Defendant had occurred. If they further believed that Defendant's admitted use of the phrase "cock gazer" demonstrated an awareness that J.L. was likely to be affronted or alarmed, those jurors could rightly have convicted Defendant of sexual misconduct based on the outdoor incident. One or more of the other jurors could have accepted J.L.'s testimony that he saw Defendant's genitals in both of the manners described, but they could have believed Defendant's testimony that the only outdoor exposure that occurred was accidental—thereby voting to convict on the basis of the indoor incident(s) only. Such a split would result in the return of a guilty verdict on the instruction as presented, but that result would not satisfy the constitutional requirement that the jury unanimously convict Defendant based on the same event.

Because the Count III verdict director failed to address the indoor and outdoor incidents separately, the verdict returned cannot tell us whether *all* jurors agreed that the *same* qualifying offense took place. And because the defenses asserted to the indoor and outdoor events differed, I cannot conclude that *all* of the defenses asserted by Defendant were necessarily rejected by all of the jurors, thereby making it "more likely that individual jurors convicted [him] on the basis of different acts." *Celis–Garcia*, 344 S.W.3d at 159.

Regarding the majority's reliance on *Barmettler v. State*, 399 S.W.3d 523, 524 (Mo.App.E.D.2013), the fact that there is no indication in that case that the movant's trial defenses varied according to the specific incidents alleged leads me to reject the suggestion that *Barmettler* is more analogous to the instant case than *Celis–Garcia*. And in contrast to what is reported in *Barmettler*, J.L.'s reference to "baby brains" was a particularly unique and memorable one—it was not a vague reference to "other uncharged and ongoing incidents of abuse." *Id.* at 530. Finally, the State's admittedly appropriate rebuttal closing argument reference to J.L.'s "baby brains" claim also served to remind the jury—immediately before it began its deliberations—that J.L. claimed Defendant had indecently exposed his genitals by the use of both the indoor and outdoor methods.

My reluctance in finding that the type of manifest injustice found in *Celis–Garcia* also occurred here is based upon: (1) the difficulty of determining from a cold transcript what individual jurors were "more likely" to have believed in a particular case (without engaging in pure speculation); and (2) my fear that any perceived short-term gains produced by our attempts to peer inside the jury deliberation room will be outweighed by the resulting long-term harm it does to our justice system.

Nonetheless, we are the "error-correcting court," not the "law-declaring court," *see State v. Freeman*, 269 S.W.3d 422, 430 (Mo. banc 2008) (Wolff, J., concurring),

and we are bound to follow the most recent applicable precedent of our supreme court, *State v. Keightley*, 147 S.W.3d 179, 184–85 (Mo.App. S.D.2004). I will not be disappointed if I am wrong, but I simply cannot see any meaningful distinction between the instant case and what was held to have produced a manifest injustice in *Celis–Garcia*. As a result, I would grant Defendant's third point, affirm the judgment as to counts I and II, reverse and vacate the existing judgment, direct the trial court to enter an amended judgment imposing convictions and sentences only on counts I and II, and remand the Count III charge for further proceedings in a manner consistent with this court's opinion.