**STATE of Missouri, Respondent,**

v.

**Brett S. TANIS, Appellant.**

**No. WD 67859.**

Missouri Court of Appeals,
Western District.

March 18, 2008.

Craig A. Johnston, Esq., Columbia, MO, for Appellant.

Shaun J. Mackelprang, Esq., Jefferson City, MO, for Respondent.

Before HOWARD, C.J., DANDURAND and AHUJA, JJ.

JOSEPH P. DANDURAND, Judge.

Brett Tanis appeals his conviction following a jury trial for the class D felony of making a terroristic threat, section 574.115, RSMo Cum.Supp.2006, and sentence of three years imprisonment. He claims that the trial court erred in overruling his motion for judgment of acquittal because the evidence was insufficient to support the conviction. Mr. Tanis also asserts that the trial court erred in overruling his motion to dismiss, submitting Instruction No. 6, and refusing his prof-fered Instruction A because the phrase "reckless disregard" in the verdict director was not an authorized culpable mental state under section 562.016, RSMo 2000.

The judgment of conviction is affirmed.

## Facts

On the afternoon of January 11, 2006, Mr. Tanis went to the office of the president of Park University in Parkville and asked to speak to the president about taking classes at the university. The president's executive assistant took Mr. Tanis to the admissions office to talk to an admissions specialist. Mr. Tanis told the admissions specialist that he was interested in studying biotechnology. The admission specialist informed Mr. Tanis that the university did not offer such a degree, and Mr. Tanis stated that he was also interested in psychology. The admission specialist then referred Mr. Tanis to a professor in the psychology department.

Mr. Tanis met with the professor in his office later that day. They discussed various psychology classes. Mr. Tanis told the professor that he was from Colorado and that he had "stopped in Kansas City because it was a midpoint in the country." Mr. Tanis talked about running for office and said he had contacts on the East Coast. He also mentioned several times that he wanted to have a "long enduring intimate relationship." Based on their conversation, the professor suggested that Mr. Tanis meet with the campus counselor.

The next day, January 12, Mr. Tanis returned to campus. At approximately 9:15 a.m., he walked into the office of the president's receptionist and then into the president's office. He was dressed the same as he had been the day before and seemed very angry. The president's executive assistant asked Mr. Tanis to leave because he was not supposed to be there.

Mr. Tanis slammed the door of the president's office. The executive assistant called Park University Public Safety and told them she needed help immediately.

A short time later, Mr. Tanis emerged from the president's office and asked the assistant to call the admissions specialist and make an appointment for him. Mr. Tanis then went back into the president's office, and the assistant pushed her "panic button" two times and went into the hallway. Mr. Tanis exited the president's office from the back door, and the assistant told him not to return and that she had called security. Mr. Tanis ran out of the building.

At approximately 10:00 a.m., Mr. Tanis abruptly entered the office of the psychology professor that he had spoken with the day before. Mr. Tanis apologized to the professor, calmly placed a note on his desk, and left. A map to the university was drawn on the front of the note, and the words "I love you. Will you marry me?" were written on the back.

In the meantime, campus security had responded to the panic alarm in the president's office and began searching for Mr. Tanis. The director of security found him in a professor's office in the College for Distance Learning in the Academic Underground.[1] Mr. Tanis told the professor and the security chief that he was from Homeland Security to test the security of the university and that because anybody could drive onto the campus at any time, the university failed the test. He was agitated as he spoke and became more agitated and less coherent as time passed. The security chief asked Mr. Tanis for his identification, and Mr. Tanis provided his passport. At one point, Mr. Tanis tried to make a call from his cell phone, but because they were 150 feet underground, he could not get a signal. He commented that he felt like they were in a bunker and that "someone could drive a truck with a bomb in there." He also stated that President Bush was not alive, that he had had his head cut off, and that is why they only saw films of him. Mr. Tanis informed the men that the campus security breach was very serious and that he was going to report the university to Homeland Security. He also wanted the men to call a meeting of the entire student body so that he could address it. Finally, Mr. Tanis said that "he realized he might go to jail or die for this, but he was willing to die for it because it was that serious."

Law enforcement officers from the Parkville Police Department and the Platte County Sheriff's Department arrived. Mr. Tanis told the officers that he was "in charge of" and "was taking over" the university. He then said, "Well, I guess now you're in charge," "You have jurisdiction now," and "Oh, well, you're with the county so you're a higher authority."

The Parkville police officer arrested Mr. Tanis for trespassing. Mr. Tanis was fidgety and agitated, but did not resist arrest. Nothing unusual was found during a search of his person. He was handcuffed and escorted to a patrol car. He told the officer three times that he wanted the officer to do a thorough inventory of the contents of his truck.

The officer and Mr. Tanis drove to Mr. Tanis's truck, which was parked in the parking lot of Mackay Hall where the president's office was located. During the short car ride, Mr. Tanis told the officer that he had explosives in his truck. He stated that "if the police did not handle the situation correctly that he would assume

---

1. The Academic Underground at Park University is a system of caves that have been con-

verted into offices, libraries, classrooms, and conference rooms.

command." Mr. Tanis also referred to a "detonator" in Colorado and asked the officer if his cell phone was turned on.

Mr. Tanis's truck was a 2001 Ford Ranger pickup truck. The cab of the truck was full of boxes, papers, and several other things. The bed of Mr. Tanis's truck was filled to the top of the cab and covered with a tarp. The officer could not determine what was under the tarp. He asked Mr. Tanis specific questions about the location and type of explosives. Mr. Tanis refused to answer the questions and made incoherent statements about assuming command and taking over. The police officer called his supervisor to the scene. They decided to treat Mr.Tanis's truck as a "potential threat," evacuate Mackay Hall, and notify other law enforcement agencies including the Kansas City bomb squad. The entire campus was eventually evacuated.

Using a robotic device with a camera, the bomb squad first viewed the interior of the truck's cab and attempted to remove the tarp covering the items in the bed of the truck. The robot was only able to loosen one corner of the tarp. Consequently, two bomb squad members put on protective suits and removed the tarp. The bed of the truck was full of cardboard boxes and other containers. The bomb squad searched through all of the containers over the next several hours but found no explosives.

Mr. Tanis was charged by first amended information with the class D felony of making a terroristic threat. A jury trial was held, and Mr. Tanis was found guilty of the charge. The trial court entered a judgment of conviction and sentenced Mr. Tanis to three years imprisonment. This appeal by Mr. Tanis followed.

### Sufficiency of the Evidence

In his first point on appeal, Mr. Tanis contends that the trial court erred in overruling his motion for judgment of acquittal at the close of the evidence because the evidence was insufficient to support his conviction. Review of a challenge to the sufficiency of the evidence to support a criminal conviction is limited to determining whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *State v. Pike*, 162 S.W.3d 464, 475–76 (Mo. banc 2005). The evidence and all reasonable inferences drawn from the evidence are viewed in the light most favorable to the jury's verdict, and any contrary evidence and inferences are disregarded. *Id.* at 476. Great deference is given to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998).

A person commits the class D felony of making a terroristic threat if such person communicates a knowingly false report of an incident or condition involving danger to life with reckless disregard of the risk of causing the evacuation of any portion of a place of assembly. Section 574.115.1(3), RSMo Cum.Supp.2006. "A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.4, RSMo 2000.

Mr. Tanis first contends that the evidence was insufficient to establish beyond a reasonable doubt that the false report made by him involved a "condition involving danger to life." He argues that although his report that he had explosives in his truck was certainly false, it cannot be said that having explosives in a truck necessarily involved danger to life because

he did not specify the type or amount of explosives or how the explosives were stored and because he never threatened to use the explosives and said that the detonator was in Colorado. Mr. Tanis also asserts that the evidence was insufficient to show that he consciously disregarded a substantial risk that the officers would evacuate part of Park University when he made the false report of having explosives in his truck. Mr. Tanis asserts that while the evidence showed that he failed to be aware of a substantial risk of evacuation, which would support a conviction for the class A misdemeanor of making a terroristic threat based on criminal negligence,[2] the evidence did not show that he consciously disregarded such a risk. Mr. Tanis's assertions are meritless.

■■■ Section 574.115 proscribes threats of violence or false public alarms made to terrorize or cause serious public inconveniences. The object of a statute such as section 574.115 is to prohibit conduct that creates serious alarm for personal safety or serious public inconvenience. MODEL PENAL CODE § 211.3 cmt. 1, 2 (1980). In this case, Mr. Tanis told the police officer that he had explosives in his truck and that he was assuming command and taking over. Explosives are inherently dangerous to human life. *See, i.e. Paisley v. Liebowits*, 347 S.W.2d 178, 182–83 (Mo. banc 1961), and *Cochran v. Burger King Corp.*, 937 S.W.2d 358, 365 (Mo.App. W.D.1996)(live explosives are an extremely hazardous material falling within the inherently dangerous substance exception to the general rule of nonliability to trespassers and licensees), and *Herman v. Andrews*, 50 S.W.3d 836, 840 (Mo.App. E.D. 2001)("the highest degree of care standard

has been held to apply in cases involving electric power lines, firearms and explosives"); *Kilventon v. United Mo. Bank*, 865 S.W.2d 741, 746 (Mo.App. W.D. 1993)(in wrongful death action brought by survivors of fire fighters killed in explosion while fighting fire at highway construction site against Missouri Highway and Transportation Commission, premises in the case were a dangerous condition because of the presence of explosives in unmarked trailers for purposes of sovereign immunity exception); Section 571.020, RSMo Cum.Supp.2006 (making it a crime to knowingly possess, manufacture, transport, repair, or sell an explosive weapon). To hold, as Mr. Tanis asserts, that his failure to specify the type or amount of explosives or his intent to detonate them makes the condition less dangerous is illogical. Arguably, a situation involving explosives may be more dangerous if authorities do not know the specific type or amount of explosives that they are dealing with. Furthermore, the dangerousness of explosives was evidenced by law enforcement's, and in particular the bomb squad's, response to Mr. Tanis's report. First, officers evacuated Mackay Hall and then the entire campus. To keep its members out of harm's way, the bomb squad initially utilized a robotic device to attempt to locate the reported explosives. Only when they were unable to remove the tarp on the bed of the truck did the bomb squad send in members in protective suits to search for the explosives. Mr. Tanis's report of explosives in his truck parked in the middle of a busy college campus was a condition involving danger to life creating serious alarm for personal safety and/or serious public inconvenience.

---

**2.** "A person 'acts with criminal negligence' or is criminally negligent when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.5, RSMo 2000.

Furthermore, the evidence was sufficient to prove that Mr. Tanis consciously disregarded a substantial risk that at least a part of the university would be evacuated when he made the false report of having explosives in this truck. A defendant's intent is rarely proven by direct evidence. *State v. Yole*, 136 S.W.3d 175, 182 (Mo. App. W.D.2004). Instead, "intent may be proven by inferences drawn from the surrounding circumstances." *Id.* Mr. Tanis showed his awareness of the current climate in this country when he stated several times that he was from the Department of Homeland Security, the federal agency created to prevent terrorist attacks within the United States. Mr. Tanis also stated that "he realized he might go to jail or die for this, but he was willing to die for it because it was that serious." Such understanding of the possible legal consequences of his actions further evidences Mr. Tanis's conscious disregard of the risk that a portion of Park University would be evacuated. Sufficient evidence was presented to support Mr. Tanis's conviction of the class D felony of making a terroristic threat. Point one is denied.

## Culpable Mental State

In his second point on appeal, Mr. Tanis contends that the trial court erred in overruling his motion to dismiss, submitting Instruction No. 6, and refusing his proffered Instruction A because the phrase "reckless disregard" submitted in the verdict director was not an authorized culpable mental state under section 562.016, RSMo 2000. Mr. Tanis argues that the trial court should have dismissed the case or revised the verdict director and required the jury to find that he had the purpose of causing the evacuation.

" 'A verdict-directing instruction must contain each element of the offense charged and must require the jury to find every fact necessary to constitute essential elements of offense charged.' " *State v. Doolittle*, 896 S.W.2d 27, 30 (Mo. banc 1995)(quoting *State v. Ward*, 745 S.W.2d 666, 670 (Mo. banc 1988)). Section 562.016, RSMo 2000, provides that "a person is not guilty of an offense unless he acts with a culpable mental state, that is, unless he acts purposely or knowingly or recklessly or with criminal negligence, as the statute defining the offense may require with respect to the conduct, the result thereof or the attendant circumstances which constitute the material elements of the crime."

Mr. Tanis was charged under section 574.115.1(3). The verdict director in this case required the jury to find, in pertinent part, that Mr. Tanis made his false report "with reckless disregard of the risk of causing the evacuation of any portion of Park University." The instruction further instructed the jury that "a person acts with reckless disregard of a risk of causing a result when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such result, and such disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation."

Mr. Tanis asserts that "reckless disregard" is not the same as recklessness because reckless disregard equates with culpable or criminal negligence while recklessness is defined in terms of conscious disregard. "A person 'acts with criminal negligence' or is criminally negligent when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.5, RSMo 2000. "Conscious" is defined as "involving ra-

tional power, perception, and awareness: embodying consideration and decision." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 482 (1993).

In making his argument, Mr. Tanis cites two cases, *State v. Tatum*, 414 S.W.2d 566 (Mo.1967), and *State v. Bextermueller*, 643 S.W.2d 292 (Mo.App. E.D.1982), discussing former manslaughter by culpable negligence statutes that required proof of a reckless disregard for human life. Mr. Tanis points to a pronouncement in *Tatum* that criminal negligence is synonymous with culpable negligence. Such pronouncement, however, was in dictum and was only a euphemism. *State v. Kliegel*, 674 S.W.2d 64, 68 (Mo.App. W.D.1984). The verdict-directing instruction in *Tatum* improperly authorized a finding of guilt if the defendant acted "carelessly, with criminal negligence" rather than with "culpable negligence" as the manslaughter statute required. The court stated that "[a]lthough 'criminal negligence' and 'culpable negligence' are synonymous, use of the statutory terminology would avoid any question." *Tatum*, 414 S.W.2d at 567–68 (internal citation omitted). Furthermore, "criminal negligence" did not become a guilty state of mind until enactment of the Criminal Code and, specifically, section 562.016 in 1978, eleven years after the *Tatum* decision. *Kliegel*, 674 S.W.2d at 68. Mr. Tanis's reliance on cases involving the former manslaughter by culpable negligence cases is, therefore, inapposite.

The statute defining the offense in this case, section 574.115.1(3), prescribes recklessness as the culpable mental state. Recklessness involves an awareness of risk. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). As discussed in point one, recklessness is defined in section 562.016.4: "A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." The jury in this case was instructed in accordance with the legal definition and MAI–CR. The trial court did not err in submitting the verdict directing instruction. The point is denied.

The judgment of conviction is affirmed.

HOWARD, C.J. and AHUJA, J. concur.