

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                    )
                                      )
    Plaintiff-Respondent,         )
                                      )
v.                                    )    No. SD37766
                                      )    Filed: December 18, 2024
SHANE HOWARD KEATHLEY,                )
                                      )
    Defendant-Appellant.          )

### APPEAL FROM THE CIRCUIT COURT OF WAYNE COUNTY

Honorable Mike Randazzo, Circuit Judge

### **AFFIRMED**

Shane Keathley (Defendant) was charged with the class D felony of making a terroristic threat in the first degree. *See* § 574.115.[1] At the close of all the evidence, Defendant moved for judgment of acquittal, arguing that the State failed to prove Defendant made a "true threat." The trial court overruled the motion. The jury found Defendant guilty as charged.

Presenting three points on appeal, Defendant contends the trial court erred in overruling his motion for judgment of acquittal because: (1) Defendant's statements were

---

[1] All statutory references are to RSMo (2016). All rule references are to Missouri Court Rules (2022).

not "true threats" as a matter of law; (2) the evidence was insufficient to show that Defendant "knowingly" communicated a threat to cause an incident or condition involving danger to life; and (3) the evidence was insufficient to show Defendant communicated the statement "with the purpose" of frightening ten or more people. Finding no merit in any of these points, we affirm.

## Standard of Review

"In reviewing a claim that there was not sufficient evidence to sustain a criminal conviction, this Court does not weigh the evidence but, rather, accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences." *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015) (internal brackets and citations omitted). Our review is limited to determining whether the evidence is sufficient for a reasonable fact-finder to find each essential element of the crime beyond a reasonable doubt. *See State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011); *State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008). We will not weigh the evidence anew since the "fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002); *Freeman*, 269 S.W.3d at 425. Further, "[t]he State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime." *State v. Jones*, 296 S.W.3d 506, 509 (Mo. App. 2009). "Intent is rarely susceptible to direct proof and is usually inferred though circumstantial evidence." *State v. Smith*, 668 S.W.3d 605, 608-09 (Mo App. 2023). Upon appellate review, "[c]ircumstantial evidence is given the same weight as direct evidence and the jury is free to make reasonable inferences from the

2

evidence presented." *Jones*, 296 S.W.3d at 509; *State v. Plopper*, 489 S.W.3d 848, 849-50 (Mo. App. 2016).

## Factual and Procedural Background

On the morning of March 21, 2022, Deputy Dallas Conway ("Dep. Conway" or "the deputy") of the Wayne County Sheriff's Department was on duty in his patrol vehicle, parked on a gravel area between two businesses. At approximately 7:00 a.m., Dep. Conway was approached by Defendant in his truck. Defendant asked the deputy "who he could contact that was over the Sheriff's Department in regards to all the torturing going on around town in the churches." Defendant did not seem to be under the influence of drugs or alcohol.

Dep. Conway replied that "the only other agency that [he] could think of that he could contact would be FBI, otherwise [the Sheriff's Department] could help him with whatever he needed help with." Defendant then backed out of the area and left. That initial conversation lasted only about two minutes. The deputy testified that the interaction was "concerning" to him.

Approximately five minutes later, Defendant returned in his truck. Dep. Conway placed his patrol car into drive, "just as a precautionary" measure for his own safety, before rolling down his window again. Defendant said to the deputy, "if … the Sheriff's Office aren't going to do anything about the torturing going on around town then [I'm] going to go to the school and take care of the kids [my]self." Dep. Conway asked what Defendant meant, but Defendant did not respond and instead started to leave again. The deputy told Defendant, "don't go to the school[,]" to which Defendant responded with "a click of the mouth [and a] smile and nod" of his head, before he backed out. Defendant then started driving in the direction of the elementary school, which was only about a mile, or a few minutes' drive,

3

away. The deputy did not understand Defendant to mean that he was going to "keep [the kids] from being tortured[.]"

Dep. Conway followed and attempted to catch up to Defendant. The deputy called dispatch over the radio, stating that he "had an individual that was heading towards the school[.]" Dep. Conway tried "to explain to them what the situation was," though he did not "recall" what he said "word for word." He further instructed dispatch "to contact the school to let them know."

On cross-examination, defense counsel asked Dep. Conway to read a "summary" (Summary) of his message the dispatcher typed into the system. The Summary stated that the deputy "requested back-up, advised that a guy in a gray extended cab truck said he was going to the school and shoot all the kids up." Defense counsel then moved to admit the Summary, which was admitted in evidence without objection.[2]

The dispatcher also testified that, to the best of her memory, the Summary stated "what was said by Deputy Conway." It is the dispatcher's practice to accurately record calls into the dispatch notes because they are often used for investigations "later on down the line." Based on the deputy's report, the dispatcher contacted both the school resource officer and the sheriff.

The school resource officer testified that March 21, 2022 was a school day. He was on his way to work when he got the call from dispatch that they had received a threat to the

---

[2] Defense counsel apparently sought to admit the Summary for impeachment purposes. Counsel initially asked Dep. Conway if Defendant said anything to him "about shooting anyone" and the deputy replied: "No he did not." It was then that defense counsel asked Dep. Conway about the Summary, highlighting the deputy's inconsistent words in the Summary to impeach his testimony. Further, during closing, defense counsel argued Dep. Conway was a "young, inexperienced" officer and grew up "in an age of mass hysteria[.]" Like "Chicken Little," the deputy "thought the sky was falling" and exaggerated to dispatch what Defendant told him.

4

school and that the threat was headed toward the school. The resource officer immediately called the superintendent of the school district to inform him of the threat. According to the resource officer, the superintendent decided to "lock the school down." This meant locking "all the outside doors" of all of the school campuses, with "nobody in or out," as well as "locking the classrooms down and keeping everybody in the classroom." The superintendent then communicated with the administrators and principals of the schools "to let them know what was going on" and instructed them to pass the threat "along to the teachers." Accordingly, "each teacher that would have been present at the school building would have been aware" of the threat. The resource officer confirmed that "there were teachers present at the school at that time[,]" as well as "students arriving at the school[.]" The school was closed for approximately 30 minutes due to the reported threat. The resource officer clarified that "any threat" would have initiated a lockdown, regardless of whether the threat explicitly involved a shooter or not.

Once Dep. Conway caught up to Defendant, the deputy activated his emergency lights and siren, and Defendant stopped his vehicle. At that point, Defendant was approximately a half-mile, or about a minute's drive, away from the elementary school. By then, the deputy was joined by a police officer with the city of Piedmont, who responded after overhearing the dispatch call about a threat to the school. The deputy and the officer approached Defendant's vehicle with their guns drawn, ordered Defendant to the ground, and arrested Defendant, placing him in handcuffs. The deputy testified that he arrested

5

Defendant "because of the nature of the conversation [and] the direction of travel he was going," stating that he "was not going to let [Defendant] get to the school[.]"[3]

Defendant was charged by felony information with the class D felony of making a terrorist threat in the first degree, in violation of § 574.115. The information alleged that Defendant committed this offense when he "knowingly" communicated to Dep. Conway "a threat to cause harm to students" by stating to the deputy that if law enforcement wasn't going to do anything about the torture, "then he would go to the school and take care of the kids himself," causing the evacuation of the school, an inhabitable structure.[4] Notably, prior to trial, Defendant did not file a motion to dismiss the information as insufficient because his statements failed to allege a "true threat." Nor did Defendant present a constitutional challenge that his statements were protected by the First Amendment.

At the close of the State's evidence, Defendant did move for judgment of acquittal, but that motion was overruled. Defendant did not testify or present any other witnesses on his behalf. At the close of all the evidence, defense counsel again moved for judgment of acquittal based on the same argument as his previous motion, and this subsequent motion was also overruled.

During closing, defense counsel argued to the jury that Defendant wanted "to take care of the children … to help the children." In rebuttal, the prosecutor argued:

> Threats have to be taken seriously. When someone approaches a law enforcement officer out of the blue, acting strange, and says things like there's torturing going on [in] all the churches and if you won't do something about me being tortured, I'm going to go to the school and take care of the kids

---

[3] In addition, the police officer testified that Defendant seemed depressed and had "a blank look on his face[.]" After Defendant was placed under arrest, he said, "I just needed somebody to talk to." No weapons were found on Defendant's person or in his vehicle.

[4] The information also alleged, and the trial court found, that Defendant was a prior and persistent offender.

myself.  And then travels in the direction of the school building, after a law enforcement officer told him not to, a school building that is less than three minutes away.

Law enforcement cannot sit on their hands and do nothing.  [Defendant sought] out a police officer to make this statement to, coming around not once but twice because he wanted to get a response, a reaction, for someone to notice him.  He wanted to cause a stir, and he did. … I don't have to prove to you attempted assault or attempted murder, I have to prove to you making a terrorist threat.

The jury found Defendant guilty of committing the charged offense for the purpose of frightening ten or more people.

Defendant filed a motion for new trial, which the trial court overruled.  The court sentenced Defendant to five years' imprisonment.  This appeal followed.  For ease of analysis, we address Defendant's three points out of order.

**Discussion and Decision**

*Points 2 and 3, Sufficiency of the Evidence*

Defendant's second and third points challenge the sufficiency of the evidence to support his conviction of making a terrorist threat in the first degree.  Section 574.115 provides:

1.  A person commits the offense of making a terrorist threat in the first degree if such person, *with the purpose of frightening ten or more people* or causing the evacuation, quarantine or closure of any portion of a building, inhabitable structure, place of assembly or facility of transportation, *knowingly*:

    (1) *Communicates an express or implied threat to cause an incident or condition involving danger to life*; or

    (2) Communicates a false report of an incident or condition involving danger to life; or

    (3) Causes a false belief or fear that an incident has occurred or that a condition exists involving danger to life.

7

2. The offense of making a terrorist threat in the first degree is a class D felony.

3. *No offense* is committed under this section by a person acting *in good faith with the purpose to prevent harm.*

*Id*. (emphasis added). Thus, in this case, the State had to prove that: (1) Defendant knowingly communicated an express or implied threat to Dep. Conway; (2) such communication was a threat to cause an incident or condition involving danger to human life; (3) Defendant did so with the purpose of frightening ten or more people; and (4) Defendant did not act in good faith with the purpose to prevent harm. *See* § 574.115.1(1) and .3; *see also State v. Tanis*, 247 S.W.3d 610, 614 (Mo. App. 2008) (this statute proscribes threats of violence "made to terrorize or cause serious public inconveniences").

Point 2 challenges the first two elements, arguing that Defendant's statement – that he would "go to the school and take care of the kids himself" – was insufficient to show Defendant "knowingly communicated a threat" to cause "an incident or condition involving danger to life[.]" A person "'acts knowingly', or with knowledge … [w]ith respect to his or her conduct or to attendant circumstances when he or she is aware of the nature of his or her conduct or that those circumstances exist[.]" § 562.016.3(1); *see D.C.M. v. Pemiscot County Juvenile Office*, 578 S.W.3d 776, 786-87 (Mo. banc 2019) (State had to establish that, when making the threatening statement, the defendant "was aware he was communicating an express or implied threat to cause an incident endangering human life").[5]

---

[5] In support of Defendant's argument, he relies on evidence favorable to him, namely that: (1) Dep. Conway testified Defendant never said anything to him about shooting anyone; (2) the police officer who overheard the report to dispatch similarly could not recall hearing any words about a shooting; (3) the officer testified that, after Defendant was arrested, he stated he just needed somebody to talk to; and (4) no weapons were found on his person or in his vehicle.

8

For the following reasons, there was sufficient evidence from which a reasonable juror could have found that Defendant knowingly communicated a threat to cause an incident involving danger to life.

First, contrary to this Court's standard of review, Defendant's argument ignores evidence that was most favorable to the jury's verdict. Specifically, the dispatcher testified that she recorded Dep. Conway's report to her at the time of his call as stating that "a guy in a gray extended cab truck said he was going to go to the school and shoot all the kids up." Accordingly, viewing the evidence in the light most favorable to the jury's verdict, as we must, there was sufficient evidence from which the jury could have found that Defendant told the deputy that he was going to "shoot all the kids up[,]" which constituted an express threat to cause an incident endangering human life. *See **D.C.M.***, 578 S.W.3d at 787 (a definite, declaratory statement such as "shooting up the school" indicates "awareness of the intent to cause danger to human life"); *see also **Tanis***, 247 S.W.3d at 614 (finding sufficient evidence supported the defendant's conviction for making a terrorist threat when he informed a police officer that he had explosives in his truck, parked in the middle of a busy college campus, and stated he was "assuming command and taking over").

Defendant's arguments to the contrary are unavailing. He argues that the statement in the Summary about going to the school to "shoot all the kids up": (1) "cannot be used as substantive evidence of [a] statement actually made by [Defendant]"; and (2) "[a]t most, the statement could be considered substantive evidence for what Deputy Conway communicated to dispatch." We disagree with both arguments. "It is a general evidentiary principle that, once evidence is admitted without objection, it can be used by any party for *any* purpose." **State v. Hollowell**, 643 S.W.3d 329, 341 (Mo. banc 2022) (emphasis added); *see **State v. Albarado***, 6 S.W.3d 197, 203 (Mo. App. 1999) (evidence admitted without objection "may

9

be considered along with other evidence" and the "probative worth and value of such evidence is for the trier of the facts"). Here, not only did Defendant not object to the admission of the Summary, he affirmatively submitted the Summary into evidence during cross-examination of Dep. Conway, before the dispatcher subsequently testified regarding the deputy's statements to her. Thus, Defendant's statements to Dep. Conway, as recounted by the dispatcher, could properly have been considered by the jury as substantive evidence and were sufficient to establish that Defendant communicated a threat to cause an incident involving danger to life.[6]

Further, even if the jury instead believed Dep. Conway's testimony that Defendant merely said that he would "take care of the kids himself," it was still reasonable for the jury to find that Defendant's statement was meant as a threat, particularly given evidence in the Summary about Defendant's plans to go "to the school and shoot all the kids up." *See, e.g.*, *Browder v. State*, 326 S.W.3d 33, 35-37 (Mo. App. 2010) (finding the defendant had made a threat when he stated that "someone was getting their ass kicked" and "you know me, if you don't take care of it I'll take care of it," and then, when advised not to make threats, stated "I'm not, I'm just telling you what I'm going to do"); *State v. McGirk*, 999 S.W.2d 298, 302 (Mo. App. 1999) (holding that, in the context of a judicial proceeding, the defendant's statement directly to the judge, "I'll take care of you," was "not a mere

---

[6] Defendant does not claim reversible error due to a variance between the charge and proof, but even if he had, such a claim would fail. *See State v. King*, 674 S.W.3d 218, 228-30 (Mo. App. 2023). "In order for the variance to amount to reversible error, [the defendant] must be prejudiced." *Id*. at 229 (citation omitted). Here, Defendant cannot show prejudice, as it was Defendant himself who introduced the Summary, and as such, he "may not take advantage of self-invited error nor complain about matters he himself brings into the case." *State v. Uka*, 25 S.W.3d 624, 626-27 (Mo. App. 2000); *Cole v. State*, 327 S.W.3d 589, 591 n.3 (Mo. App. 2010).

expression of his opinion or feelings" but "a threat"). In addition, Defendant's behavior before and after he made the statement supported the jury's finding that Defendant communicated the threat knowingly – aware that he made a threat. Specifically, this behavior included: (1) approaching Dep. Conway a second time, after Defendant's first approach did not produce a desired reaction; (2) when the deputy asked what Defendant meant by his statement, Defendant did not respond and instead prepared to leave; and (3) when the deputy told Defendant not to go to the school, Defendant made a clicking sound, smiled, nodded and started to leave, heading in the direction of the school. This behavior reasonably suggested that Defendant believed no clarification was necessary and the deputy already understood his threat.

Finally, the "desired reaction of the listener may constitute some evidence of the intent of the person making the statement." *C.G.M., II v. Juvenile Officer*, 258 S.W.3d 879, 883 (Mo. App. 2008); *D.C.M.*, 578 S.W.3d at 787. Here, the deputy who heard Defendant's statement expressly stated that he had *not* understood Defendant to mean that he was going to help the kids and "keep them from being tortured[.]" Instead, Dep. Conway immediately: (1) began to follow Defendant because he "was not going to let [Defendant] get to the school"; and (2) called dispatch to report that Defendant had threatened the school, with the intent that the school be notified. It was reasonable for the jury to infer from Defendant's statement, the circumstances under which it was made, and the deputy's reaction to the statement that Defendant knowingly communicated a threat to cause an incident involving danger to life. Defendant's second point, which challenges the first two elements of the charged offense, therefore lacks merit.

Point 3 challenges the third element, arguing the evidence was insufficient to show Defendant "communicated the statement with the purpose of frightening ten or more people

11

or causing closure of the school or with reckless disregard or criminal negligence with regard to the risk of causing closure of the school." For the following reasons, this point also lacks merit.

"A person 'acts purposely', or with purpose, with respect to his or her conduct or to a result thereof when it is his or her conscious object to engage in that conduct or to cause that result." § 562.016.2. Here, there was sufficient evidence from which the jury could have reasonably found that Defendant communicated the threat for the purpose of frightening ten or more people. First, the jury could have reasonably inferred from the nature of Defendant's mention of "the kids" at "the school" that Defendant intended to frighten not only the person to whom he immediately communicated his threat, but also the school children, their parents, the teachers, administrators, and anyone else connected to the school, which reasonably amounted to at least ten people. While Defendant argues that he "did not directly contact the school to make the allegedly threatening statement[,]" the jury could have nevertheless reasonably found that by choosing to make the threat to a law enforcement officer, Defendant intended that Dep. Conway would relay the threat to others, and that it would ultimately be conveyed to the school. *See* **State v. Hamilton**, 130 S.W.3d 718, 720 (Mo. App. 2004) ("When defendant made threatening statements in the presence of police officers, he could logically have expected the threats to be communicated to the [victim] in order that she could take reasonable steps to protect herself. For a police officer to do otherwise would, arguably, have been dereliction of duty"); *see also* **State v. McNabb**, 621 S.W.3d 658, 662 (Mo. App. 2021) (jury could reasonably have found that defendant intended for his family member to relay the threat to police, who would reasonably have notified the intended victim).

12

Indeed, after Defendant made the threat and left in the direction of the school, Dep. Conway quickly called dispatch to report the threat so that dispatch could inform the school. Consistently, the dispatcher testified that she informed the school resource officer of the threat, and the resource officer testified that he in turn informed the superintendent of the threat, who initiated a lockdown of the schools and relayed the threat to the administrators, principals, and teachers. *See **D.C.M.***, 578 S.W.3d at 787 (desired reaction of the listener constitutes some evidence of the intent of the person making the statement). Defendant argues that, had his statement about "taking care of the kids … been accurately relayed to dispatch," his exchange with the deputy would not have resulted in the closure of the school. However, the resource officer testified otherwise. Specifically, the resource officer testified that "any threat" would have resulted in a lockdown of the schools, regardless of whether it explicitly involved a shooter. Thus, there was sufficient evidence from which the jury could have found that Defendant knowingly communicated a threat to cause an incident involving danger to life with the purpose of frightening ten or more people. Points 2 and 3 are denied.

*Point 1, "True Threats" as a Matter of Law*

Defendant's first point contends the trial court erred in overruling his motions for judgment of acquittal because his charged statement was not a "true threat" as a "matter of law" and was "therefore constitutionally-protected speech." While Defendant characterizes his claim as merely challenging the sufficiency of the evidence to support the conviction, he argues, at least in part, that his constitutional right to "freedom of speech" under the First Amendment was violated. *See **State v. Wooden***, 388 S.W.3d 522, 525-28 (Mo. banc 2013) (analyzing separately claims of whether the evidence was sufficient to support the conviction and whether the statute was unconstitutional as applied to the defendant because his speech was protected under the First Amendment). "Constitutional violations are waived if not

13

raised at the earliest possible opportunity." ***State ex rel. York v. Daugherty***, 969 S.W.2d 223, 224 (Mo. banc 1998); *see* ***State v. Newlon***, 216 S.W.3d 180, 184 (Mo. App. 2007). In order to preserve a constitutional issue for appellate review, a party must: "(1) raise the issue at the first available opportunity, (2) state the constitutional provision claimed to be violated by specifically referencing the article and section of the constitution or by quoting the constitutional provision itself, (3) state the facts that comprise the constitutional violation, and (4) preserve the constitutional issue throughout the criminal proceeding." ***Newlon***, 216 S.W.3d at 184; ***State v. Edmond***, 363 S.W.3d 431, 433 (Mo. App. 2012). The following facts are relevant to this point.

When Defendant moved for judgment of acquittal, defense counsel argued that the State failed to prove that Defendant made a "true threat." Defense counsel argued:

> Missouri Courts have narrowed this crime to only apply to true threats as understood by the U.S. Supreme Court in *Virginia v. Black* and that's what was cited in *State v. Metzinger*.[7]

> The statements that were made [were] not an actual true threat to anybody, in fact in the statute it specifically states that no offenses [are] committed under this section by a person acting in good faith with the purpose to prevent harm.

The trial court overruled the motion stating: "The Court believes that the nature of the statement whether it's a threat or threatening is going to be up to the jury to decide. I think there's been sufficient evidence that's been presented that a jury could find that it was a threat[.]"

Defendant's motion for new trial argued, *inter alia*, that the trial court erred in overruling his motion for acquittal at the close of all the evidence because the "State did not

---

[7] *See* ***State v. Metzinger***, 456 S.W.3d 84, 95-96 (Mo. App. 2015), citing ***Virginia v. Black***, 538 U.S. 343, 358-59 (2003). Except for mentioning the name of these cases, defense counsel did not elaborate further.

14

make a submissible case" and that, by not allowing the relief he requested, the court violated his "right to due process and a fair trial under the First, Fifth, Sixth and Fourteenth Amendments[.]" Lastly, Defendant argued that the trial court erred in allowing the case to go to the jury because the evidence was "legally insufficient" in that Defendant's statements did not contain a "true threat," thereby violating his right to "due process and a fair trial[.]" Defendant's motion for new trial was also overruled.

In support of his arguments under Point 1 – that the information was insufficient because the charged statements did not constitute a "true threat" as a "matter of law" and were instead "constitutionally-protected speech" – Defendant relies on *State v. Metzinger*, 456 S.W.3d 84 (Mo. App. 2015), but that case is procedurally distinguishable. In *Metzinger*, the defendant filed a *pretrial* motion to dismiss the information as insufficient pursuant to Rule 24.04(b)(2). *Metzinger*, 456 S.W.3d at 88-89.[8] The defendant in *Metzinger* argued "the information does not, and cannot, allege all essential elements of section 574.115" because the defendant's "sarcastic posts on Twitter did not constitute 'true threats' as a matter of law and cannot be punished by the State." *Id*. at 89. The tweets at issue were published during a World Series baseball game at Busch Stadium and referred to detonation of a pressure-cooker bomb similar to that set off during the Boston Marathon. The defendant argued the tweets were merely "overt trash talking" and not a true threat. *Id*. The trial court agreed, and the eastern district of this Court affirmed, explaining that "a statement constitutes

---

[8] Defendant is correct that upon a pretrial motion to dismiss, "whether an information fails to state an offense is a question of law, which we review *de novo*." *Metzinger*, 456 S.W.3d at 89. Similarly, as part of that analysis, whether the allegedly threatening messages constituted "true threats" was also a legal question to be determined by the trial court upon the motion to dismiss. *Id*. at 94; *see Plopper*, 489 S.W.3d at 851 n.3 (when properly raised before the trial court, whether "statements constitute a true threat is an issue of law that would ordinarily be reviewed *de novo*").

a 'true threat' when, on its face and in light of the circumstances in which it was made, it communicates a serious, present intent to inflict physical harm on another." *Id*. at 97.

The *Metzinger* Court also addressed constitutional concerns under the First Amendment, stating:

> "The freedom of speech guaranteed in the United States and Missouri Constitutions limits the ability of our legislature to criminalize spoken words." *State v. Roberts*, 779 S.W.2d 576, 578 (Mo. banc 1989).
>
> "The protections afforded by the First Amendment, however, are not absolute ...." *Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Wooden*, 388 S.W.3d at 526 (quoting *Chaplinsky*, 315 U.S. at 571-72, 62 S.Ct. 766). "Unprotected speech includes 'the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Id.* (quoting *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766).

*Metzinger*, 456 S.W.3d at 95. The Court concluded that the tweets were protected speech under the First Amendment and were therefore improperly criminalized, affirming the dismissal of the information for insufficiency. *Id*. at 98.

As we understand Defendant's argument, he relies on *Metzinger* to argue that because he raised the "true threat" issue to the trial court in his motion for judgment of acquittal at the end of trial, the same analysis as that of a pretrial motion to dismiss applies. According to Defendant: (1) the trial court erred in refusing to resolve it as an issue of law; (2) our appellate review is *de novo* and limited to the statements as charged in the information only; and (3) we are to ignore all evidence adduced at trial. We reject these arguments.

Instead, we conclude that, for the following reasons, Defendant failed to preserve his claims for our review.

First, unlike ***Metzinger***, Defendant failed to bring both his challenge to the sufficiency of the information and his constitutional claim in a motion to dismiss *pretrial –* before evidence is presented and when review is confined to the charged statements in the information only. ***Id***. at 88-89. In ***State v. Colville***, 687 S.W.3d 637 (Mo. banc 2024), our Supreme Court recently clarified that, upon a motion to dismiss an indictment or information, the circuit court is "prohibited from considering *any* evidence or finding *any* facts." ***Id***. at 639 (emphasis added). "Instead, to determine the sufficiency of an indictment or information, a court must 'look at it from its four corners, and in its entirety.'" ***Id***.[9]

Further, because Defendant failed to bring his challenges to the sufficiency of the information in a pretrial motion to dismiss, those challenges are waived. Rule 24.04(b)(2) requires defenses and objections based on defects in the information to be raised "only by motion before trial" or such defenses and objections are waived:

> Defenses and objections based on defects in the institution of the prosecution or *in the indictment or information* other than that it fails to show jurisdiction in the court or to charge an offense may be raised *only by motion before trial*. The motion shall include all such defenses and objections then available to the defendant. *Failure to present any such defense or objection as herein provided constitutes a waiver* thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding.

---

[9] Moreover, our Supreme Court went on to say that, to the extent ***Metzinger*** "suggests a circuit court always may consider evidence outside the charging document on a motion to dismiss, it should no longer be followed." ***Colville***, 687 S.W.3d at 641 n.7.

17

Rule 24.04(b)(2) (emphasis added); *see* **State v. Cerna**, 522 S.W.3d 373, 381-82 (Mo. App. 2017) ("challenge to the sufficiency of the indictment must be raised in a motion prior to the commencement of trial"); **State v. Carlock**, 242 S.W.3d 461, 464 (Mo. App. 2007) (defendant's challenge to the information during trial "was untimely because it was not raised by motion before trial"; defendant's challenge was therefore waived).

Similarly, Rule 24.04(b)(2) specifies the proper time to raise constitutional issues. **Turner**, 48 S.W.3d at 696; *see also* **Wooden**, 388 S.W.3d at 525 (defendant properly filed a pretrial motion to dismiss the charges arguing that they violated his constitution rights to freedom of speech). Here, Defendant did not raise his constitutional claim in a pretrial motion to dismiss, and therefore, failed to raise the issue at the earliest opportunity. **Turner**, 48 S.W.3d at 697 (defendant's "motion to dismiss at the close of the State's case was not timely"). Because Defendant failed to raise his constitutional claim at the earliest opportunity, it was waived. **Daugherty**, 969 S.W.2d at 224; **Hollis v. Blevins**, 926 S.W.2d 683, 684 (Mo. banc 1996); *see also* **Cerna**, 522 S.W.3d at 382-83 (noting that defendant "first raised his constitutional claim in his memorandum in support of a judgment of acquittal" and holding that the "decision to wait eighteen months to submit an issue 'of such dignity and importance' to the court necessitates denial of his claims as unpreserved").

Lastly, Defendant failed to preserve his constitutional claim for another reason. *See* **Newlon**, 216 S.W.3d at 184. Nowhere in Defendant's motions for judgment of acquittal, his argument before the trial court, or in his motion for new trial did Defendant specify that he was claiming the charged statements violated his right to free speech protected under the First Amendment. This provides further support for our conclusion that he failed to properly preserve his constitutional issue for our review. *See, e.g.*, **Edmond**, 363 S.W.3d at 434-35 (because the defendant never specifically raised the constitutional issue before the trial court,

18

he failed to preserve the issue for our review); *see also* **Plopper**, 489 S.W.3d at 851 n.3 (alleged constitutional violation that was not raised below is therefore waived; if defendant believed his "words were improperly criminalized, he was required to make that argument to the trial court, and his failure to do so preserves nothing for our review"); **Turner**, 48 S.W.3d at 697 (untimely constitutional claim preserves nothing for review).

Thus, by failing to challenge the charged statements in a pretrial motion to dismiss, Defendant forfeited the kind of review that is only available "before trial." Rule 24.04(b)(2); **Colville**, 687 S.W.3d at 639; *see* **Metzinger**, 456 S.W.3d at 89. Once evidence had been presented, Defendant was relegated to challenging the sufficiency of the evidence, as he did via his motion for judgment of acquittal at the end of trial. Therefore, our review of that challenge is set forth in our long-standing standard of review specifically applied in Points 2 and 3.[10] Because Defendant failed to timely and properly raise his challenge to the sufficiency of the information and his alleged constitutional violation, both claims are waived. **Cerna**, 522 S.W.3d at 382-83; **Turner**, 48 S.W.3d at 697. Preserving nothing for our review, Point 1 is denied.

The judgment of the trial court is affirmed.

JEFFREY W. BATES, J. – OPINION AUTHOR

---

[10] Defendant relies on the procedural posture in **United States v. Barcley**, 452 F.2d 930 (8th Cir. 1971) (arising from South Dakota) to raise a "true threat" issue at the end of the trial, but Defendant's reliance on that case is misplaced. In **Barcley**, the defendant was charged with mailing threatening communications, which included "any threat … to injure the person[.]" *Id*. at 931 n.1 (citing 18 U.S.C. § 876). At the close of the government's case, the defendant moved for judgment of acquittal, arguing his letter could not reasonably be construed as a threat of personal injury – an element of the crime. *Id*. at 932. **Barcley** does not aid Defendant here, because the defendant's argument there was reviewed in terms of sufficiency of the evidence to support the elements of the charged offense – the same type of review we conducted in Points 2 and 3.

JENNIFER R. GROWCOCK, J. – CONCUR

BECKY J. WEST, J. – CONCUR